**Michael R. PATTERSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–1278.**

Court of Appeals of Alaska.

Dec. 11, 1987.

Larry D. Card and Kevin M. Morford, Anchorage, for appellant.

John A. Scukanec and James V. Gould, Asst. Attys. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION

BRYNER, Chief Judge.

Michael R. Patterson was convicted, following a jury trial, of two counts of sexual abuse of a minor in the first degree (AS 11.41.434(a)(1)), one count of sexual abuse of a minor in the second degree (AS 11.41.436(a)(2)), and one count of failure to ap-

pear (AS 12.30.060). Superior Court Judge James A. Hanson sentenced Patterson to consecutive terms totalling eighteen years with six years suspended. Patterson appeals, challenging the validity of his conviction and arguing that his sentence is excessive. We reverse.

## FACTS

On September 29, 1984, C.D. reported to the police that her eight-year-old daughter, E.D., had been sexually abused by Michael Patterson. Patterson had been C.D.'s live-in boyfriend since July 1981.

Anchorage Police Officer Steven H. Warner interviewed E.D. E.D. had never told anyone about the abuse before. Warner found the child to be "somewhat more reluctant [to speak] than ... the average child [victim of sexual abuse]." Warner asked her questions requiring a yes or no answer and used anatomically correct dolls during the interview. E.D. indicated that Patterson had touched her vagina and her "butt" with his hand and his penis, and that he had licked her vagina. She also stated that Patterson had placed his penis in her mouth and had gotten her to touch it with her hands. E.D. described Patterson's semen as "sorta white" and said, "it usually gets on my stomach." E.D. stated that there had been no penetration, either by Patterson's tongue or penis.

According to E.D., the assaults occurred at home, most often while her mother was at work. E.D. reported that Patterson had abused her about ten times that year, but said that her mother had only seen it happen once. E.D. estimated that Patterson had performed cunnilingus on her five times, rubbed his penis on her vagina ten times, rubbed his penis on her "butt" five times, and put his penis in her mouth three or four times. She stated that the abuse started in the winter of 1983. The last incident occurred on September 14, 1984.

Officer Warner also interviewed C.D. She stated that in the early morning hours of September 13 or 14, 1984, she went to E.D.'s bedroom and discovered Patterson lying on top of her daughter. Patterson was dressed only in a shirt. E.D. wore only a pajama top; C.D. "could see her bottom, it was bare." When Patterson noticed C.D., both he and E.D. "jerked like they were scared ... he tried to pull his shirt around him." C.D. and Patterson then had a lengthy conversation, in which Patterson admitted his past abuse of E.D. Patterson told C.D. that he had put his mouth on E.D.'s vagina, placed his penis in her mouth, and rubbed his penis on her vagina. He told C.D. that the abuse had been going on for a year or two.

Based on the information provided by E.D. and C.D., Warner placed Patterson under arrest at approximately 2:30 a.m.[1] At the police station, Patterson gave a statement to Warner in which he generally acknowledged engaging in sexual contact with E.D. "off and on like almost a year." Patterson did not describe exactly what he had done to E.D., but asked Warner how he could deal with his problem. Apparently under the impression that Patterson wanted to consult with an attorney, Warner ceased questioning and did not press Patterson for details of the sexual contact.

Patterson was subsequently tried and convicted for the incidents of abuse described by E.D. However, during her testimony at trial, E.D. claimed to have forgotten many details regarding the abuse. C.D. was also unable to recall details regarding the abuse; she was unable to remember Patterson's confession to her as well as information she had previously reported to the police and grand jury.

## GRAND JURY BIAS

On appeal, Patterson initially contends that he was deprived of his right to an

---

1. Warner made the arrest without a warrant at Patterson's home at approximately 2:30 a.m. In a subsequent affidavit, Patterson claimed that he "asked [Warner] if he had a warrant and [Warner] stated that he did not need one and would come in anyway even if he had to break in." Patterson claimed that he "was not in-

formed that [he] was under arrest, and when [he] asked why [he] was being arrested, [he] was told that '[he] should know.'" Warner testified at trial that he did not recall if he specifically told Patterson what the charges against him were.

unbiased grand jury because an Anchorage police officer served as a member of the grand jury panel that indicted him.

■ In order to prevail on this argument, Patterson must establish both bias and prejudice. *Hohman v. State,* 669 P.2d 1316, 1319 (Alaska App.1983). Even if a grand juror's employment as a police officer would constitute bias disqualifying the juror from service,[2] it does not follow that dismissal would be called for. Alaska Rule of Criminal Procedure 6(f)(2) provides, in relevant part:

> An indictment shall not be dismissed upon the ground that one or more members of the grand jury were not legally qualified if it appears from the record kept pursuant to section (j) of this rule that a majority of the total number of grand jurors, after deducting the number not legally qualified, concurred in finding the indictment.

In this case, Patterson's indictment was returned by a unanimous vote of fifteen grand jurors. Assuming that one member of the grand jury was biased by virtue of his employment as a police officer, Criminal Rule 6(f)(2) would appear to preclude dismissal.

Patterson argues, however, that his right to an unbiased grand jury is guaranteed by the Alaska Constitution. *See, e.g., Coleman v. State,* 553 P.2d 40 (Alaska 1976). He maintains that the limitations on dismissal set out in Criminal Rule 6(f)(2) cannot override this constitutionally protected right.

■ We find no constitutional infringement, however, since we perceive no conflict between the right to an unbiased grand jury and the requirement of a showing of prejudice under Criminal Rule 6(f)(2). Patterson's argument mistakenly equates the bias of one grand juror for bias on the part of the entire grand jury panel. In the absence of particularized circumstances establishing the likelihood of a significant influence on the grand jury as a whole, we see no legitimate basis for imputing the bias of one grand juror to others. Because the grand jury voted unanimously to indict Patterson, and because Patterson has, at most, established bias on the part of only one member of the panel, no deprivation of Patterson's right to a fair and unbiased grand jury has been established.[3]

---

**2.** *But see* Alaska Rule of Criminal Procedure 6(f)(1), which provides that the prosecuting attorney or defendant may challenge an individual juror on the ground that the juror is not legally qualified. Legal qualifications for jurors, set out in AS 9.20.010–.020, would not preclude a police officer from jury service. Although, under Alaska Rule of Criminal Procedure 24(c)(14), the accused would have the right to exercise a challenge for cause as to a prospective juror actively employed as a police officer, it is questionable whether the right to exercise a challenge for cause under Criminal Rule 24(c) can be equated with legal qualification to serve as a juror, as provided for under Criminal Rule 6(c). Federal Rule of Criminal Procedure 6, which is similar to Alaska's rule, has consistently been interpreted to preclude dismissal of an indictment based on individual juror bias rather than on statutory qualifications. *See* 1 C.A. Wright, Federal Practice and Procedure, § 102 at 208 (2d ed. 1982).

**3.** Because it calls into question the continuing validity of the indictment, Patterson's grand jury argument must be considered in spite of our ultimate conclusion that reversal of Patterson's conviction is required on other grounds. Two additional issues similarly requiring immediate consideration are capable of being summarily decided. First, Patterson contends that the trial court erred in failing to dismiss his indictment on the ground that his arrest was unlawful. However, the trial court was well within the scope of its discretion in concluding that Patterson's arrest was supported by probable cause. To the extent that Patterson attempts to argue on appeal that his arrest was otherwise procedurally improper, we find that the arguments were not raised below and are foreclosed. *Moreau v. State,* 588 P.2d 275 (Alaska 1978). Second, Patterson argues that insufficient evidence was presented at trial to support his conviction. Viewing the evidence in the light most favorable to the state, however, we believe that fair-minded jurors could conclude that Patterson's guilt was established beyond a reasonable doubt. *Siggelkow v. State,* 648 P.2d 611, 613 (Alaska App.1982). We find that the evidence was sufficient.

Patterson has raised several additional arguments. He contends that the trial court erred in denying his motion for a bill of particulars, in allowing admission of E.D.'s prior consistent statements, and in making various other evidentiary rulings; he also challenges his sentence as excessive. Our reversal of this case on other grounds renders decision of these issues unnecessary.

## IMPROPER FINAL ARGUMENT

Patterson next alleges that the prosecutor made improper statements to the jury during both the opening and rebuttal stages of her final argument.

Our analysis of this issue is informed by Standard 3–5.8 of the A.B.A. Standards for Criminal Justice.[4] This provision restricts argument to the evidence presented at trial and the inferences that may fairly be drawn therefrom. It prohibits the prosecutor from expressing a personal belief as to the evidence, from making appeals calculated to inflame passions and prejudices of the jury, and from advancing arguments based on the consequences of the verdict or on issues other than the guilt or innocence of the accused. *See generally Potts v. State,* 712 P.2d 385 (Alaska App.1985).

The first challenged portion of argument involved an episode of name-calling in which the prosecutor referred to Patterson as "a crud" and a "child molester:"

> PROSECUTOR: [C.D. (the mother of the victim, E.D.)] claims not even to remember being in the interview room with [E.D.] when her own flesh and blood was telling a police officer that that crud over there had her put her mouth on his penis—excuse me.
>
> DEFENSE COUNSEL: Objection, Your Honor. Objection, Your Honor.
>
> THE COURT: Sustained, sustained.
>
> DEFENSE COUNSEL: I think the appropriate way to refer to the defendant....
>
> THE COURT: Disregard the characterization.

PROSECUTOR: That that child molester over there, from whom lots of people think are cruddy people, unless you're like [C.D.] who don't think that they're so bad....

The prosecutor's comments constituted a personal attack on Patterson's character, which was not at issue, and were obviously calculated to appeal to the passions and prejudices of the jury. The trial court, however, properly sustained Patterson's objection and correctly instructed the jury to disregard the prosecutor's characterization. Had this been the sole instance of impropriety, the trial court's instruction would in all likelihood have cured any potential prejudice. *See Roth v. State,* 626 P.2d 583, 585 (Alaska App.1981). *See also Jackson v. State,* 652 P.2d 104, 110 (Alaska App.1982).

But this is not the only alleged impropriety. The next episode involved the prosecutor's comment on Patterson's being charged with failure to appear. The evidence on this charge indicated that, following his arrest and release pending trial in Anchorage, Patterson fled to Boise, Idaho. Referring to Patterson's flight, the prosecutor argued:

> PROSECUTOR: He boogalooed off to Boise because he knew we had him cold. He had to have known that we were going to get a conviction. And he was scared to death. He didn't think this case was shaky or he wouldn't have left. He would have stood and fought it. But like the chicken that he is, like the chicken he would have to be to sexually abuse a
> . . .

---

**4.** Standard 3–5.8 provides:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

1 A.B.A. Standards for Criminal Justice § 3–5.8 (2d ed. 1982).

**539**

DEFENSE COUNSEL: Object, Your Honor.

PROSECUTOR: ... precious child like this ...

THE COURT: Overruled.

PROSECUTOR: ... he left town. In the dark of the night, putting one of his best friends on the line who had been ordered by a court to watch him, he left. Because he knew this case was strong, and he knew he was going to get convicted by you if he ever had to face you.

■ The trial court did not specify its reason for overruling Patterson's objection to this argument. Perhaps the court concluded that the objection merely questioned the propriety of arguing that Patterson's flight could be considered as evidence of his consciousness of guilt. Because this theory was within the scope of reasonable inferences that might be drawn from the evidence, it was, in substance, a proper subject for comment. *See, e.g., Darling v. State*, 520 P.2d 793, 794 (Alaska 1974). *See also Gunnerud v. State*, 611 P.2d 69, 74 (Alaska 1980).

It is not at all clear, however, that Patterson's objection was directed at the substance of the prosecutor's argument.[5] And while the substance of the argument may have been proper, its form plainly was not. The prosecutor's reference to Patterson as a "chicken," and her suggestion that he "would have to be" a chicken "to sexually abuse a precious child like this," amounted, again, to a personal attack on Patterson's character and an unwarranted appeal to the jury for sympathy toward the victim. The prejudicial impact of the argument could only have been heightened in the minds of the jury by the fact that it was made with the apparent sanction of the court. It is nevertheless questionable whether this argument was in and of itself sufficiently prejudicial to require reversal.

We need not decide the point, for it is rendered moot by a far more serious instance of impropriety that developed near the conclusion of the state's rebuttal, when the prosecutor specifically called upon the jury to consider the possible consequences of its verdict:

PROSECUTOR: Ladies and gentlemen of the jury, I'm not going to try and argue to you that you're the last effort to protect this child. That would be playing on your sympathy. We have a children's court that I hope has the courage to take that child away from that mother and protect her decently. And if Mr. Patterson is convicted, Judge Hanson can make appropriate orders to make sure the child is protected. But we—we can protect [E.D.] —hopefully we'll be able to protect her.

DEFENSE COUNSEL: Objection ...

PROSECUTOR: But what I ask you ...

DEFENSE COUNSEL: Your Honor, excuse me (indiscernible). I'm sorry. I would object to counsel continually worrying about what the other court's going to do with the child. It's really not relevant to our case, Your Honor. It's not proper rebuttal also.

PROSECUTOR: Your Honor, I believe that this jury is entitled to understand what the impact of their verdict is.

DEFENSE COUNSEL: Well, Your Honor, that's what we're talking about. Punishment and other things. If they —it's really not ...

THE COURT: Sustained.

DEFENSE COUNSEL: Thank you.

PROSECUTOR: Ladies and gentlemen of the jury, let me put it to you this way. Proof beyond a reasonable doubt is addressed by the court as meaning the kind of decision you've got to make in important affairs of your life. And certainly child protection and protection of children is an important issue for you and every other citizen in our community. Ladies and gentlemen of the jury, if you had to decide whether [E.D.] were living with Michael Patterson in the future,

---

**5.** While a party must ordinarily specify the grounds for an objection, here, the trial court's immediate, summary ruling effectively cut short Patterson's opportunity to explain his reasons for objecting.

what decision would you make? That's an important decision for that child's life. Do you hesitate to say ...

DEFENSE COUNSEL: Objection, Your Honor. Excuse me, [prosecutor], I'm sorry. I hate to interrupt, but Your Honor, it really is not relevant to our case about the future of the child. The child is not on trial nor the mother.

PROSECUTOR: Your Honor, it is an absolute valid analogy. It is an important analogy for reasonable doubt.

THE COURT: It's an analogy only and the jury should regard it only as an analogy. The objection is in part sustained. We are not really concerned with [E.D.], but the analogy (indiscernible).

PROSECUTOR: Let me—and this is what it's based on. It's an analogy. If you were having to make a decision as important as where this child were living, what decision would you make based on the evidence you've heard. Do you think this evidence is really so shaky that it would be all right for [E.D.] to live with Michael Patterson? Or do you really have a reasonable doubt about his guilt? You probably have got no doubt. And you'd know where the safe alternative would be for her. And it would not be with him. And, ladies and gentlemen of the jury, the children of the state of Alaska, in addition to [E.D.] are entitled to that kind of consideration from you. Because, you see, there is a lot of people like Nathaniel Zehrung out there who don't know the evidence like you do. And who expose their children to risk. Ladies and gentlemen of the jury, these laws are important laws and they need to be enforced. They need to be enforced because it's your duty as a juror to decide the facts as you know them to be, and they are good laws that protect our children.

This argument appears to have been little more than a calculated and unabashed appeal to the emotions of the jury; its presentation was in open derogation of A.B.A. Standard 3–5.8(d):

> The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

1 A.B.A. Standards for Criminal Justice § 3–5.8(d) (2d ed. 1982). The unmistakable drift of the argument was that the jury should base its verdict not on the strength of the evidence presented but rather on its concern for assuring the continued safety of the victim. When Patterson cut short the prosecutor's effort to argue the consequences of the verdict openly, the prosecutor, with the court's approval, proceeded to reintroduce the very same topic, thinly and transparently clothed as an "analogy" explaining the requirement of proof beyond a reasonable doubt.

Given the inherently emotional context of a criminal trial involving the sexual abuse of a young child, it hardly seems likely that the point of the state's argument was lost on the jury. We seriously doubt whether even the most conscientious of jurors could fully have heeded the trial court's admonition to consider the state's argument only as an "analogy."

But even conceding the possibility that our skepticism is ill-founded, and even assuming the jury was capable of such analytical abstraction, the prosecution's argument remains deeply troubling. As an analogy, the argument is fundamentally misleading; it effectively stands the reasonable doubt standard on its head.

By way of analogy, the prosecutor equated reasonable doubt with hesitation; from there, she invited jurors to consider if they would hesitate before allowing Patterson to continue living with the victim:

> Do you think this evidence is really so shaky that it would be all right for [E.D.] to live with Michael Patterson? Or do you really have a reasonable doubt about his guilt? You probably have got no doubt. And you'd know where the safe alternative would be for her. And it would not be with him.

This argument subverts the reasonable doubt standard by suggesting that Patterson was to be acquitted only if the jury could find without hesitation that E.D. would be safe living in his home. In essence, the prosecutor urged the jury to convict Patterson unless convinced beyond a reasonable doubt of his innocence.

The prosecutor advanced this explanation of the reasonable doubt standard with what appeared to be the express approval of the trial court, after Patterson's efforts to object had been overruled. Because the explanation was made during the rebuttal portion of the state's argument, Patterson had no opportunity to respond. Under these circumstances, we cannot readily dismiss the improper argument as harmless error. *Compare Potts v. State,* 712 P.2d 385 (Alaska App.1985).

We recognize that the state's case against Patterson was strong. Yet it was not overwhelming. The trial testimony of both C.D. and E.D. conflicted sharply with their prior statements and was far less inculpatory. Patterson attempted to characterize his own statement to the police as ambiguous, and not necessarily inculpatory. Though this characterization seems somewhat implausible, it is neither inherently unbelievable nor demonstrably false. Having carefully considered the totality of the prosecutor's improper final argument in the context of the record as a whole, we cannot say that the impropriety did not appreciably affect the jury's verdict. *Love v. State,* 457 P.2d 622, 629–34 (Alaska 1969).

Accordingly, the conviction must be REVERSED.