**1374**

Randy SMITH, Appellant,

v.

STATE of Alaska, Appellee.

No. A–2392.

Court of Appeals of Alaska.

April 14, 1989.

Christine S. Schleuss, Anchorage, for appellant.

Tonja Woelber, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Randy Smith was convicted of misconduct involving a controlled substance in the third degree—possession of cocaine with the intent to deliver—a class B felony, in violation of AS 11.71.030(a)(1). Smith appeals, contending that the trial court committed two errors: (1) by excluding certain evidence he wished to offer regarding out-of-court experiments, and (2) by permitting the prosecutor to make an improper final argument. We affirm.

## FACTS

Anchorage Police Officer Matthew Dahl and Reserve Officer Eric Dodson testified for the state. The officers testified that they were on routine patrol in Eagle River, Alaska, at approximately 7:40 a.m. on Wednesday, April 29, 1987. They drove along Skyline Drive to its end and were in the process of turning around in a lot/turn-around when they noticed a pickup truck. The sole occupant of the pickup truck was slumped over, and the officers suspected he might be intoxicated. Dahl exited his vehicle and approached the pickup. According to Dahl, as he approached the pickup, the driver shifted into reverse and ignored his orders to stop. The pickup then took off and the officers pursued. Upon turning a corner, the officers saw that the pickup had stopped and parked. They testified that they observed an individual, later identified as Randy Smith, walk around in front of the truck, throw something down the hill and get back into the truck. Dahl estimated they were 100 yards away when Smith threw the object. Dodson initially estimated they were 100 yards away, but immediately changed his answer to indicate that he thought they were approximately 100 feet from the pickup truck. The officers then contacted Smith and asked him to leave the truck. Smith left the truck and was placed under arrest.

Dahl went down the hill to search for the object thrown. Dahl testified that, within approximately one minute, he found a plastic baggie containing white powder approximately twenty-five feet down the hill. The contents were preserved and later found to be cocaine. The baggie was tested for fingerprints, but no identifiable fingerprints were found. According to the officers, at the time of his arrest, Smith admitted that the white powder was cocaine, which he said he was holding for a friend. The officers testified that Smith begged the officers to have mercy on him and pour out a quantity of the cocaine.

Smith testified in his own defense. His testimony was in sharp contrast to the officers' testimony. Smith denied that he fled the police, denied that he threw any object down the hill, denied that he made any incriminating statements to the police, and strongly intimated that he had been framed. Smith testified that when he first saw the officers, he was waiting in his pickup truck for his girlfriend to arrive so that they could go hiking, and that he was bent over putting on his hiking boots. Smith said that he saw the officers as he was pulling out and that he waved and that they appeared to wave back. He then left the area to check for his friend in another spot. Smith also suggested that unsuccessful efforts were made to get him to handle the package of cocaine, and that the reserve police officer expressed an unwillingness to become "involved" in framing Smith.

The bag containing the cocaine was tested for fingerprints by a state expert, Katherine Monfreda. No useable fingerprints were recovered. The expert also discussed how fingerprints are left on items and why it is difficult to get good fingerprints off of plastic, including baggies. Monfreda did note that using modern techniques, she could successfully obtain fingerprints from baggies in well over fifty percent of her attempts. Monfreda conceded that some people leave better fingerprints than others; she outlined a number of circumstances which might explain why no fingerprints were found on the baggie even though it had been handled by one or more people.

It was in this context that the defense sought to introduce the testimony of Lyle Davis, a former police officer, who is currently a private investigator. Outside the presence of the jury, Davis testified that he had had Smith pick up and throw a number of baggies filled with flour to approximate the weight of cocaine. Davis reported that he successfully lifted prints from each of the baggies. The trial court sustained an objection to the experiment, based in part on the fact that Davis had used clean new baggies (the evidence suggested the baggie containing the cocaine had been old and wrinkled).

The defense then offered the testimony of a second former police officer, Gerald Regan. This officer was to testify that he had performed a similar experiment with Smith using crumpled baggies thrown into a dirty alley. The officer would testify that in each case, Smith left recoverable fingerprints on the baggie. The trial court also rejected this offer.

Essentially, Judge Rowland reasoned that there were many obvious dissimilarities between the circumstances under which the experiment was performed and the circumstances under which the baggie containing the cocaine was allegedly thrown. In Judge Rowland's view, there was nothing in the record that would permit the jury to intelligently evaluate those dissimilarities to determine whether any of the dissimilarities were significant or not. Without such evidence, Judge Rowland was of the view that the jury could not intelligently determine the probative value of the experiment on the issue for which it was offered: specifically, that if Smith had thrown the baggie, his fingerprints would have appeared on it and, conversely, because his prints did not appear on the baggie, he had not handled it.

Finally, Smith also wanted to introduce testimony of another private investigator, James Davis. Apparently, this investigator

conducted several experiments whereby a baggie containing flour to simulate cocaine, was thrown into an area near the place the officers testified Smith had thrown the baggie containing the cocaine. The investigator then asked a group of people to disperse and see if they could find the baggie. The investigator timed the various attempts to retrieve the baggie. The purpose of the experiment was to discredit Officer Dahl's testimony that he was able to recover the baggie which was tossed approximately twenty-five feet into the alders within a minute. The trial court sustained an objection to testimony regarding these experiments as well.

## DISCUSSION

The Supreme Court of Alaska has addressed the admission of experimental evidence in a number of cases. *See, e.g., Yukon Equipment, Inc. v. Gordon,* 660 P.2d 428, 436 (Alaska 1983); *American Nat'l Watermattress Corp. v. Manville,* 642 P.2d 1330, 1337–38 (Alaska 1982); *Patricia R. v. Sullivan,* 631 P.2d 91, 98–101 (Alaska 1981); *Stumbaugh v. State,* 599 P.2d 166, 170–72 (Alaska 1979); *Nicholson v. State,* 570 P.2d 1058, 1064–65 (Alaska 1977); and *Love v. State,* 457 P.2d 622, 627–29 (Alaska 1969).

The Alaska Rules of Evidence, like their federal counterparts, do not expressly address the admissibility of experimental evidence. *See* 3 D. Louisell & C. Mueller, *Federal Evidence* § 390 at 666 (1979 & Supp.1988). Consequently, federal cases follow the general rules of relevancy contained in Federal Rules of Evidence 401–403 when evaluating experimental evidence. *See, e.g.,* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[05] at 403–83 to –85 (1985 & Supp.1988); 22 C. Wright & K. Graham, *Federal Practice & Procedure* § 5171 (1978 & Supp.1987). An examination of these authorities indicates that the treatment experimental evidence receives under the federal rules does not significantly differ from the treatment experimental evidence received at common

law. *See, e.g.,* 2 Wigmore, *Evidence* §§ 445–60 (Chadbourn rev.1979).

This treatment is also similar to that which experimental evidence has received in the Alaska cases. *Love* is the leading case. In *Love,* the supreme court said:

[F]or such [experimental] evidence to be admissible, it should have been developed under conditions substantially similar to those surrounding the event in issue. The rule of substantial similarity of conditions does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative. In some cases a high degree of similarity may not be attainable, yet the evidence nevertheless may be enlightening to the jury.

. . . .

In other words, if the differences of condition can be explained, so that the effect of those differences upon the experiment can be evaluated rationally, the judge may exercise his discretion and admit the evidence, for it can be helpful to the jury. But the judge cannot use his discretion to decide that despite a plain lack of substantial similarity in conditions he will, nevertheless, admit the evidence. In cases concerning the admissibility of experimental evidence, the foundation for admissibility should be scrutinized closely to determine whether the conditions surrounding the experiment were substantially similar to those of the alleged occurrence.

In applying the test of substantial similarity, the trial court should be guided by the following principles: Are the dissimilarities likely to distort the results of the experiment to the degree that the evidence is not relevant? Can the dissimilarities be adjusted for or explained so that their effect on the results of the experiment can be understood by the jury? In this connection the court must consider the purpose of the experiment and the degree to which the matter under experiment is a subject of precise

science. Absolute certainty is not required if the experiment would be considered valid by persons skilled or knowledgeable in the field which the experiment concerns.

This determination of whether substantial differences exist may not always be capable of a mechanical solution, but the same may be said about most trial court evidentiary determinations that employ notions of relevance or materiality. Frequently common sense provides a good guide to whether a factor entering into an evidentiary determination is substantial or merely unimportant.

*Love,* 457 P.2d at 627–28 (footnotes and citations omitted). In applying the test, the supreme court stressed that any such determination is subject to evaluation for probative value and that the trial court has broad discretion to admit or exclude such evidence. *Id.* In discussing the trial judge's discretion, the court noted:

> In regard to experiments and courtroom demonstrations, Professor McCormick states that: The general requirement of similarity of conditions applied to experimental evidence generally applies with equal force to experiments in court. Manifestly, the trial judge can best determine whether the confusion and delay incident to the court-room experiment outweighs its value, and his

wide discretionary power to permit or exclude the experiment is constantly emphasized.

*Id.* at 627 n. 5 (quoting *Gargan v. State,* 436 P.2d 968, 972 (Alaska 1968)).

Before discussing these general principles further, it is useful to differentiate between three different types of evidence which may be offered to the trial court as "experiments." The first type of "experiment" is an in-court demonstration of how something material to the issues in controversy works. Illustrative of this type of experiment was the attempt in *Schleunes v. American Cas. Co. of Reading, Pa.,* 528 F.2d 634, 636–38 (5th Cir.1976) to demonstrate to the jury how a rifle works. The second type of "experiment" is a rigorous scientific investigation of the physical or chemical characteristics of a given substance or object. *See* Comment, *Validity and Relevancy Analysis: An Approach to the Admission of Experimental Evidence,* 26 Me.L.Rev. 273–95 (1974). The final type of experiment is an attempt to reenact events as described in the testimony. *See Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir.1981). Recognizing the distinction between these three different kinds of "experiments" explains why courts are more demanding regarding similarity of circumstances in some cases than others. *See* Comment, *supra,* at 281–84, 288–91.[1]

1. The writer of the Comment suggests that three separate questions must be addressed in determining the admissibility of experimental evidence. First, was the experiment valid? Second, is the experiment relevant? Third, is the relevance or probative value of the experiment outweighed by secondary considerations. Comment, *supra,* at 285–95. Earlier in the discussion, the author explains the meaning of experimental validity and differentiates it from legal relevance as follows:

> Validity is determined by the evaluation of an experiment as scientific inquiry and is based on intrinsic assurances of accuracy found in a scientifically acceptable experiment.
>
> . . . .
>
> . . . Experimental validity is a scientific judgment; relevancy, a legal judgment. An experiment is valid if, as a matter of scientific principles and method it is properly designed and conducted to sustain or refute the experimental hypothesis. The determination of va-

lidity is based upon intrinsic guarantees of accuracy in the experimental method, such as the trustworthiness of the techniques employed and their appropriateness to the particular test proposition. Unlike other forms of evidence, an experiment may be examined after the fact to assess both its validity and its limitations. A statement of the experimental hypothesis reveals what the experiment was and was not designed to prove, while the analysis of experimental validity shows whether the hypothesis has been proved and how strongly.

> Validity does not mean that an experiment will always accomplish its purposes, nor that the experimental method is infallible. It means only that it is possible to determine whether the hypothesis has been successfully tested, what facts the experiment demonstrated, and how conclusively it demonstrated them. An examination of the experimental method of acquiring information and testing

In this case, Smith's testimony was in direct conflict with that of the officers. If Smith was to be believed, he was the victim of a frame-up. Conversely, if the officers were to be believed, Smith was a confessed possessor of cocaine. The linchpin of the state's case was the baggie of cocaine found at the scene, which the officers alleged they saw Smith throw down the hill. In order to raise a reasonable doubt, the defendant sought to attack the credibility of the officers by showing that he had not thrown the baggie containing cocaine down the hill. Smith sought to syllogize to this conclusion through negative evidence. Smith reasoned that if he had handled the baggie he would have left his fingerprints on the baggie. He further reasoned that since there were no fingerprints found on the baggie, he could not have handled the baggie. *See Esmailka v. State,* 740 P.2d 466, 470 (Alaska App.1987).

Central to Smith's syllogism is the proposition or hypothesis that if he had handled the baggie and thrown it down the hill, he would have left his fingerprints on it. The state's expert indicated that under test conditions and using newer methods, she could recover fingerprints from plastic baggies in well over fifty percent of her attempts. However, the expert also noted that there were numerous reasons why someone could handle a baggie and not leave fingerprints on it. Smith attempted to show through his witnesses that when he handled plastic baggies, he invariably left fingerprints on them.

██ Smith's experiments purported to simulate actual events and to show the jury what presumably occurred at the time in question. It was in fact a reenactment of what the officers testified took place at the scene. It is important to stress, however, that Smith denied that any such event had occurred. His reenactment was an attempt to show that the officers had testified falsely. However, where an experiment purports to simulate actual events and to show the jury what presumably occurred at an earlier occasion, the party introducing the evidence bears the heavy burden of demonstrating the substantial similarity of conditions in order to provide a fair comparison. An examination of the case law suggests that, in the area of reenacting past events, courts are least willing to allow testimony of "out-of-court experiments." *See, e.g., Love,* 457 P.2d at 627–29; *United States v. Michelena–Orovio,* 702 F.2d 496, 499–500 (5th Cir.1983) (investigator testified that he had "smelled marijuana" which aroused his suspicion; defendant sought to introduce evidence that marijuana could not be "smelled;" the court found circumstances substantially differed and excluded the evidence), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984); *Jackson,* 647 F.2d at 1026–28; *Pacheco v. United States,* 367 F.2d 878, 881–82 (10th Cir.1966) (undercover officer testified that he had hidden in trunk of vehicle and overheard drug transaction; defendant offered evidence of a reenactment in which people in trunk of same vehicle with tape recorders had been unable to pick up conversations in the vehicle; evidence excluded); *People v. Manson,* 71 Cal.App.3d 1, 139 Cal.Rptr. 275, 299–300 (1977) (prosecution witness testified that she had heard specific individual scream; defendant sought to set up "screaming line-up" to prove that witness could not have identified voice under the circum-

propositions should clarify the meaning and importance of validity.
*Id.* at 276–77 (footnotes omitted). Later in the discussion, the author further discusses this difference between experimental validity and legal relevancy:
> The difference between validity and relevancy is simply that a valid experiment is not necessarily relevant. The intellectual process of validity analysis examines factors entirely different from those pertinent to relevancy

analysis. An experiment might prove conclusively that water becomes a solid at certain temperature. It is difficult, however, to see any connection between that result and the question of whether oxygen is an element of the water molecule. A valid experiment, then, may produce irrelevant results.
*Id.* at 282 (footnote omitted). The Comment suggests that the "similarity" test often blurs the distinction between validity and relevancy. *Id.*

stances as she testified; evidence excluded), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1582, 55 L.Ed.2d 803 (1978). In *Pacheco,* the court's reluctance to accept evidence of this kind was explained as follows:

> Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused. In many instances, a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful.

*Id.,* 367 F.2d at 881–82 (quoting *Hisler v. State,* 42 So. 692, 695 (Fla.1906)). We are satisfied that the trial court did not abuse its discretion in concluding, for the reasons it gave, that the experiments offered by the defense would not have been helpful to the jury in this case.

■ Smith next argues that the trial court committed plain error by permitting the prosecutor: (1) to call Smith a liar; (2) to vouch for the credibility of Officers Dahl and Dobson (the investigating officers) and Katherine Monfreda (the expert fingerprint witness); and (3) to allege that one of defense counsel's reenactments was an attempt to fool the jury. Smith relies on *Patterson v. State,* 747 P.2d 535 (Alaska App.1987) and *Potts v. State,* 712 P.2d 385 (Alaska App.1985). In those cases, this court expressed concern about prosecutorial misconduct in closing argument. In *Patterson* we said:

> [Standard 3–5.8 of the ABA Standards for Criminal Justice] restricts argument to the evidence presented at trial and the inferences that may fairly be drawn therefrom. It prohibits the prosecutor from expressing a personal belief as to the evidence, from making appeals calcu-

lated to inflame passions and prejudices of the jury, and from advancing arguments based on the consequences of the verdict or on issues other than the guilt or innocence of the accused.

*Id.,* 747 P.2d at 538.

Smith is correct that it is usually improper for the prosecutor to call the defendant a liar, and virtually always improper to suggest that defense counsel corroborated perjury. *See United States v. Peyro,* 786 F.2d 826, 831 (8th Cir.1986); *Harris v. United States,* 402 F.2d 656, 657–59 (9th Cir.1968); *Whitherow v. State,* 765 P.2d 1153, 1155 (Nev.1988). This is an unusual case, however. In this case, the parties were not arguing over what inferences might properly be drawn from circumstantial evidence. Here, we had a direct conflict in the evidence. If the police were believed, Smith was a confessed possessor of cocaine. If Smith was believed, he was the victim of a conscious frame-up. Given the lack of an objection, we do not find plain error in this case. *See People v. Adcox,* 47 Cal.3d 207, 253 Cal.Rptr. 55, 763 P.2d 906, 920–21 (1988) (under the circumstances it was not misconduct for the prosecutor to characterize defendant's version of the incident as "fabrication").

The judgment of the superior court is AFFIRMED.