NOTICE

*The text of this opinion can be corrected before the opinion is published in the*
*Pacific Reporter. Readers are encouraged to bring typographical or other formal*
*errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| ROBERT D. KOWALSKI,<br><br>      Appellant,<br><br>   v.<br><br>STATE OF ALASKA,<br><br>      Appellee. | Court of Appeals No. A-12061<br>Trial Court No. 1JU-11-1245 CR<br><br><br>O P I N I O N<br><br><br>No. 2606 — June 22, 2018 |

Appeal from the Superior Court, First Judicial District, Juneau,
Louis James Menendez, Judge.

Appearances: Kelly Taylor, Assistant Public Defender, and
Quinlan Steiner, Public Defender, Anchorage, for the Appellant.
Donald Soderstrom, Assistant Attorney General, Office of
Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney
General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock,
Superior Court Judge. [*]

Judge ALLARD.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska
Constitution and Administrative Rule 24(d).

In July 1996, while visiting Yakutat from Washington state, Robert Kowalski shot and killed his girlfriend, Sandra Perry, in their hotel room. Following an investigation by the Alaska State Troopers, the shooting was classified as an accident and the case was closed. Twelve years later, in 2008, while living in Montana, Kowalski shot and killed his girlfriend, Lorraine Morin. After a thirty-hour standoff with police, Kowalski surrendered. Kowalski initially told investigators that the shooting was an accident, but he later entered a no-contest plea to mitigated deliberate homicide.[1]

The 2008 shooting death of Kowalski's girlfriend in Montana led the State of Alaska to reopen its investigation into the 1996 Yakutat shooting. In 2011, a grand jury indicted Kowalski on alternative counts of first- and second-degree murder for the 1996 death of Sandra Perry. At Kowalski's trial on these charges, the State was permitted to introduce evidence of the 2008 Montana shooting under Alaska Evidence Rules 404(b)(1) and 404(b)(4). The jury was unable to reach a verdict on the first-degree murder charge, but the jury convicted Kowalski of second-degree murder.

Kowalski now appeals his murder conviction, arguing that the trial court committed reversible error when it allowed the State to introduce evidence of the 2008 shooting under Evidence Rules 404(b)(1) and 404(b)(4). Kowalski additionally argues that the trial court committed reversible error when it denied Kowalski's request to introduce a 1996 legal memorandum prepared by the Department of Law. This memorandum was given to Perry's family, and it explained why the State was not prosecuting Kowalski for Perry's death at that time. For the reasons explained here, we

---

[1]　*See* Montana Stat. 45-5-103(1) (providing that a person commits mitigated deliberate homicide when he "purposely or knowingly causes the death of another human being ... under the influence of extreme mental or emotional stress for which there is a reasonable explanation or cause").

conclude that neither of these evidentiary rulings require reversal of Kowalski's conviction.

Lastly, Kowalski requests that this Court review the unredacted versions of various emails that the State submitted to the trial court for *in camera* review. Based on our independent review, we conclude that the redactions were appropriate and that the defense was provided with all of the non-privileged information that it had requested.

*Background facts and prior proceedings*

*The 1996 shooting in Yakutat*

In 1996, Robert Kowalski, who was living in Washington at the time, took a trip to Yakutat with his girlfriend, Sandra Perry. During their trip, Kowalski and Perry stayed at Glacier Bear Lodge, which was co-owned by Kowalski's friends James Ross and Martha Indreland. Ross and Kowalski had hunted moose together during Kowalski's previous trip to Yakutat, and Ross felt comfortable giving Kowalski a shotgun for protection against bears. Ross went over the safety features of the shotgun with Kowalski. Kowalski had owned shotguns in the past and, according to Ross, "seemed to know all the right answers and the right steps" pertaining to gun safety.

On July 20, Kowalski and Perry had a verbal altercation in which Kowalski appeared to be upset with Perry for speaking to a group of fishermen. Later that night, Kowalski and Perry had dinner and drinks at the hotel bar. They left the bar around 2:00 a.m. and returned to their room with more drinks.

Richard Tenwolde was staying in the adjacent room. Tenwolde reported hearing arguing from Kowalski's room at around 2:00 a.m. Tenwolde heard Perry repeatedly say "fuck you," and then he heard a gunshot. Tenwolde woke his brother-in-law, who was in the room with him, and the two walked outside and looked around. They did not see anything, and they went back to sleep.

Eight hours later, Kowalski left the room, went to the front desk, and reported that Perry had been shot. According to Martha Indreland, Kowalski was "hysterical" and barely understandable. It sounded like Kowalski was saying "boo" or "boom," and Indreland "got the gist that something bad had happened to [Perry]."

Police officers arrived at the Glacier Bear Lodge around 1:00 p.m. Perry's body was in one of the beds, and a shotgun was leaning against the bed. James Jensen, a Yakutat police officer, conducted two interviews with Kowalski and had him provide a blood sample. Randel McPherron, an Alaska State Trooper, also questioned Kowalski twice, and the trooper reenacted the shooting with Kowalski's guidance.

Kowalski told the officers that he had heard a "bumping on the wall or window" and thought it might be a "person or a bear." According to Kowalski, he grabbed the shotgun, which was leaning up against the wall, and went to the window. Kowalski told the police that Perry was in bed with a cigarette, and that she needed a light. Kowalski went to light her cigarette. According to Kowalski, Perry said "boo" or "move" or "Bob." He was startled, and he tripped on the corner of the bed. The gun went off, and the shot killed Perry instantly. Kowalski said that he stayed in the room for many hours after Perry died because he was shocked and unable to move. During that time, he unloaded the shotgun, considered suicide, reloaded the shotgun, and then unloaded the shotgun again.

Based on the police investigation of the shooting, the Department of Law concluded that there was insufficient evidence to charge Kowalski with any crime related to Perry's death and that there was insufficient evidence to disprove Kowalski's claim of accident.

Richard Svobodny, the assistant district attorney on the case, wrote a memorandum which he sent to Perry's sister, detailing the reasons his office was declining to prosecute Kowalski for killing Perry. These reasons included the fact that

Kowalski's description of the events had remained relatively consistent across multiple interviews with only minor discrepancies that could be explained away. There was no evidence of a fight or a struggle in the hotel room, and there was no evidence suggesting that Perry's body had been moved or the scene otherwise altered. The medical examiner also found no defensive wounds on Perry.

Approximately two years later, in 1998, most of the evidence from the investigation into Perry's death was destroyed. Among the evidence that was destroyed were the audio recordings of the interviews with the witnesses and the audio recordings of the three interviews with Kowalski, which included the reenactment of the shooting.

*The 2008 shooting in Montana*

In 2008, Kowalski was living in Montana and staying part-time at the home of his girlfriend, Lorraine Morin. In March 2008, Morin returned home from a bar where she had been drinking. Kowalski was at the house, and he had also been drinking.

According to Kowalski's statement to the police, he and Morin got into a fight when Morin got home. The fight continued off and on throughout the evening, growing louder and more physical. At one point, Kowalski took Morin's handgun from the dresser and fired a shot into the television. He also threatened to kill himself. They fought over the gun, and Morin was able to get the gun from Kowalski, but then she handed the gun back to him and told him to kill himself.

A short time later, they began to struggle over the gun again. According to Kowalski, he pushed Morin down into the chair, and went to "plop[]" down in a different chair. When he "plopped" down, the gun went off, shooting Morin in the head and killing her instantly.

Kowalski remained in Morin's home with the dead body until the next morning. He then left and told a friend what had happened. That friend called the

police. The police received the report around 11:00 a.m., twelve hours after the shooting.

When police arrived at the home, a thirty-hour standoff ensued. At one point during the standoff, Kowalski fired a shot as the police approached his window. He later claimed that he was "startled ... and the gun just went off." Kowalski ultimately surrendered to police. Kowalski told the police that his girlfriend was shot when the gun accidentally went off, but Kowalski later pleaded no contest to mitigated deliberate homicide.[2]

The Montana shooting led the State of Alaska to reopen its investigation into the death of Perry in 1996. In 2011, as a result of the renewed investigation, a grand jury indicted Kowalski on first- and second-degree murder charges for the death of Perry.

*Kowalski's trial in Alaska*

Prior to trial, the State filed a motion seeking to admit evidence of the Montana shooting, as well as ten other acts of domestic violence by Kowalski, under Evidence Rule 404(b)(4).[3] After conducting a balancing test under *Bingaman v. State*,

_____

[2] *See* Montana Stat. 45-5-103(1)*; see also North Carolina v. Alford*, 400 U.S. 25, 38 (1970) (permitting a defendant who maintains his innocence but admits that the prosecution would likely be able to prove his guilt beyond a reasonable doubt to plead no contest in a criminal case).

[3] *See* Alaska Evid. R. 404(b)(1) ("Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."); Alaska Evid. R. 404(b)(4) ("In a prosecution for a crime involving domestic violence ... evidence of other
(continued...)

the trial court excluded most of the other acts of domestic violence as more prejudicial than probative. But the court ruled that the 2008 Montana shooting was admissible because the two shootings were so strikingly and remarkably similar.[4] The court also ruled that the 2008 Montana shooting was independently admissible under Evidence Rule 404(b)(1) because it was relevant to rebut Kowalski's claim of accident or mistake. The court acknowledged the potential for unfair prejudice that might result from allowing this evidence to be introduced, but the court concluded that this could be addressed by strong limiting instructions.

At Kowalski's trial, the State's case rested primarily on the evidence from the original investigation. Various witnesses from the investigation testified, including the guest in the neighboring room who had heard the gun shot, the owners of the lodge, and other people who had interacted with Kowalski and Perry at the time. Trooper McPherron and the other troopers involved in the original investigation also testified, as did the medical examiner who examined Perry's body, the firearms investigator who examined the shotgun, and the crime scene reconstructionist who examined the crime scene. The State was also able to introduce the original crime scene photographs, which had been preserved.

The State acknowledged that most of the physical evidence from the original investigation had been destroyed. The jury was also given a *Thorne* instruction telling them to presume that the evidence from the original investigation that had been

---

3    (...continued)
crimes involving domestic violence by the defendant against the same or another person ... is admissible.").

4    *See Bingaman v. State*, 76 P.3d 398 (Alaska App. 2003).

destroyed (which included the audio tapes of the interviews with Kowalski) would have been favorable to Kowalski.[5]

In addition to the witnesses and evidence from the original investigation, the State also introduced evidence concerning the 2008 Montana shooting that the trial judge had ruled admissible under Evidence Rule 404(b)(1) and 404(b)(4). The State also introduced evidence that indicated Kowalski had given somewhat inconsistent accounts of the 1996 shooting to various people in the years since Perry's death.

Kowalski's defense was that the shooting was an accident and the State's original decision not to prosecute Kowalski was the correct one. The defense attorney emphasized the thoroughness of the original investigation and the fact that little had changed since then other than witnesses' memories had grown stale and the physical evidence had been destroyed. The defense attorney urged the jury to focus on the actual evidence related to the 1996 shooting and not to be distracted by the evidence related to the 2008 Montana shooting. The defense attorney also emphasized how devastated Kowalski had been by Perry's death, and how it had changed him as a person.

Following deliberations, the jury hung on the charge of first-degree murder, but convicted Kowalski of second-degree murder.

This appeal followed.


*Kowalski's ex post facto claim*

Alaska Evidence Rule 404(b)(4) provides, in relevant part, that "[i]n a prosecution for a crime involving domestic violence ... evidence of other crimes involving domestic violence by the defendant against the same or another person ... is

---

[5]   *See Thorne v. Dep't of Public Safety*, 774 P.2d 1326, 1331-32 (Alaska 1989).

admissible." This rule was enacted by the legislature in 1997, a year after the criminal acts alleged in this case occurred.

On appeal, Kowalski argues that because Evidence Rule 404(b)(4) did not exist at the time he committed his alleged offense, application of this rule to his case violated the ex post facto clauses of the United States Constitution and the Alaska Constitution. As Kowalski acknowledges, we previously considered and rejected a similar ex post facto argument with regard to a comparable evidentiary rule change in *Allen v. State*.[6]

In *Allen*, we addressed the retroactivity of Alaska Evidence Rule 404(a)(2), which authorizes the trial court to admit evidence of a defendant's character for violence when this evidence is offered by the government to rebut a claim that the victim was the first aggressor.[7] Relying on the United States Supreme Court's decision in *Collins v. Youngblood*, we held that retroactive application of Rule 404(a)(2) did not violate the ex post facto clause of either the state or federal constitution because it was a rule of evidence that did not "alter the definition of crimes or increase the punishment for criminal acts."[8]

We reached a similar conclusion in *Hendrickson v. State*, an unpublished memorandum decision in which we addressed the retroactivity of Alaska Evidence Rule 404(b)(3).[9] (Rule 404(b)(3) authorizes admission of a defendant's prior acts of sexual

---

[6]  *Allen v. State*, 945 P.2d 1233, 1237 (Alaska App. 1997); *see also State v. Coon*, 974 P.2d 386, 392 (Alaska 1999) (changes to rules governing the admissibility of evidence do not violate the prohibition on ex post facto laws).

[7]  *Allen*, 945 P.2d at 1237.

[8]  *Id.* (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)).

[9]  *Hendrickson v. State*, 1997 WL 115921, at *2 (Alaska App. Mar. 12, 1997)

abuse or attempted sexual abuse in a trial involving charges of sexual abuse, provided that certain conditions are met.)

Kowalski contends that we should revisit our ex post facto analysis in these cases because of the United States Supreme Court's decision in *Carmell v. Texas*[10] — a case that was decided after our decisions in *Allen* and *Hendrickson*.

We agree with Kowalski that the *Carmell* decision clarified that there is a category of evidentiary rules where retroactive application of the rule violates the prohibition against ex post facto laws. But neither the evidence rules at issue in *Allen* or *Hendrickson*, nor the evidence rule at issue in the present case, fall within that category.

In *Carmell*, the United States Supreme Court distinguished between "ordinary" rules of evidence — *i.e.*, rules which regulate the admissibility of evidence — and "sufficiency of the evidence" rules of evidence. Rules in this latter category, although often designated as rules of evidence, actually specify the type or quantum of proof required to support a criminal conviction as a matter of law. Retroactive application of such rules violates the ex post facto clause.[11]

For example, the Texas statute at issue in *Carmell* abolished an earlier provision of Texas law which declared that convictions for certain sexual offenses could not rest on the uncorroborated testimony of the victim.[12] As the United States Supreme Court explained, the elimination of this corroboration requirement reduced the quantum of evidence needed to support a conviction under Texas law. That is, the new statute

---

[9]   (...continued)
(unpublished).

[10]   *Carmell v. Texas*, 529 U.S. 513, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

[11]   *Carmell v. Texas*, 529 U.S. at 532-34 & n.23, 544-46; 120 S.Ct. at 1632-33 & n.23, 1638-1640.

[12]   *Id.*, 529 U.S. at 516, 120 S.Ct. at 1624.

altered the legal definition of what constituted sufficient proof of these sexual offenses — and altered it in a manner that reduced the government's burden. Thus, the Supreme Court concluded, retroactive application of this Texas statute violated the ex post facto clause.

The same cannot be said, however, of the evidence rule at issue here. Alaska Evidence Rule 404(b)(4) fits squarely within the category of "ordinary rules of evidence" described in *Carmell*. It regulates the admissibility of certain evidence (evidence of prior crimes of domestic violence) when a defendant is being tried for a crime involving domestic violence. Unlike the Texas statute at issue in *Carmell*, Evidence Rule 404(b)(4) does not alter the type or quantum of evidence that is legally required to support a conviction for a crime of domestic violence. We therefore reject Kowalski's contention that application of Evidence Rule 404(b)(4) at his trial violated the federal ex post facto clause.

Kowalski argues in the alternative that we should expand the scope of the ex post facto protection provided by the Alaska Constitution to cover the retroactive application of rules like Evidence Rule 404(b)(4). Kowalski points out that Rule 404(b)(4) expanded the type of "other crime" evidence that could be admitted at a trial for a crime of domestic violence, and that the evidentiary change primarily benefits the prosecution. Kowalski contends that the ex post facto clause of the Alaska Constitution should protect defendants against these types of "one-sided" evidentiary rule changes.

In support of this argument, Kowalski cites two Oregon cases in which the Oregon Supreme Court held that Oregon's ex post facto clause prohibits the retroactive application of evidentiary rule changes "that alter the rules of evidence in a one-sided way that makes conviction of a defendant more likely."[13] But the Oregon Supreme

---

[13] *See State v. Fugate*, 26 P.3d 802, 813 (Or. 2001); *see also State v. Guzek*, 86 P.3d
(continued...)

Court's ex post facto analysis appears to be an outlier among state court decisions. Kowalski points to no other appellate court that has adopted such an expansive view of its state constitution's ex post facto clause.

In addition, neither of the Oregon cases cited by Kowalski involved an ex post facto analysis of an evidence rule like Alaska Evidence Rule 404(b)(4). In contrast, the courts in jurisdictions that have specifically addressed comparable evidence rules have consistently held that these types of evidence rules do not implicate ex post facto concerns.[14] We find the reasoning of these courts sound and in accord with our Alaska law. We also note that although Evidence Rule 404(b)(4) expands the type of prior bad act evidence that is admissible against a defendant in a domestic violence trial, this expansion is offset, at least in part, by the requirement that the trial court also conduct

---

[13]   (...continued)
1106, 1112-14 (Or. 2004), *vacated and remanded*, 546 U.S. 517 (2006), *and modified*, 153 P.3d 101 (Or. 2007).

[14]   *See, e.g.*, *State v. Kibbee*, 815 N.W.2d 872, 885 (Neb. 2012) (retroactive application of an evidentiary rule change that expanded the admissibility of prior sexual assault evidence did not violate the ex post facto clause because the change did "not affect the sufficiency of the evidence [or] change the quantum of evidence needed for the conviction"); *State v. Willis*, 915 So. 2d 365, 381-83 (La. App. 2005) (retroactive application of an evidentiary rule change that removed prior restrictions on the admissibility of certain prior bad act evidence did not violate the ex post facto clause, because the change "merely pertain[ed] to the *type of evidence* which may be introduced" and such evidence was admissible if it fell into one of the exceptions); *People v. Dolph-Hostetter*, 664 N.W.2d 254, 260-61 (Mich. App. 2003) (retroactive application of a new exception to the marital privilege did not violate the ex post facto clause because the new rule simply affected what evidence might be introduced at trial and did not change quantum of proof); *McCulloch v. State*, 39 S.W.3d 678, 684-85 (Tex. App. 2001) (retroactive application of an evidentiary rule change that expanded the type of evidence admissible in child sex cases did not violate the ex post facto clause, because even though the new rule "relax[ed] the strictness associated with Rule 404(b)", it did not "alter the quantum of proof required by law to support the conviction").

a robust balancing test and assess the potential for unfair prejudice before the court can allow this evidence to be admitted at a defendant's trial.[15]

Accordingly, we reject Kowalski's ex post facto claim on appeal.

*Why we conclude that the trial court did not abuse its discretion when it admitted evidence of the 2008 Montana shooting*

Kowalski also argues that even if evidence of the 2008 Montana shooting was admissible under Alaska Evidence Rule 404(b)(4), the trial court erred in concluding that the probative value of the evidence outweighed the risk of unfair prejudice.

In *Bingaman v. State*, we held that Evidence Rule 404(b)(4) did not deprive a defendant of due process because any evidence admitted under this rule was still subject to the constraints of Evidence Rules 402 and 403.[16] We then outlined six factors that a trial judge is required to consider when deciding whether to admit evidence of a defendant's prior acts of domestic violence under Rule 404(b)(4).[17]

The record in this case shows that the trial judge carefully and conscientiously evaluated all six *Bingaman* factors, and that the judge concluded that the probative value of the Montana shooting with regard to the disputed issues of intent and absence of mistake outweighed the risk of unfair prejudice. The judge based this decision, in large part, on his finding that the two shootings were "remarkably similar." The record supports this finding. Indeed, the similarities between the two cases are stark: in both cases, Kowalski and a girlfriend were alone and arguing; in both cases, Kowalski shot his girlfriend in the head and then delayed reporting his girlfriend's death for many

---

[15] *See Bingaman v. State*, 76 P.3d 398 (Alaska App. 2003).

[16] *Bingaman*, 76 P.3d at 410.

[17] *Id*. at 415-16.

hours; and in both cases Kowalski claimed (at least initially, in the Montana case) that the shooting was an accident.

Given the notable similarities between these two events, we cannot say that the trial court abused its discretion when it determined that this evidence was probative of Kowalski's mental state and that its relevance outweighed the risk of unfair prejudice under both the *Bingaman* factors required for Evidence Rule 404(b)(4) and the Rule 403 balancing test required under Evidence Rule 404(b)(1).

Accordingly, we conclude that the superior court did not abuse its discretion when it admitted evidence of the 2008 Montana shooting at Kowalski's trial.

*Kowalski's claim that the trial court erred in refusing to allow Kowalski to introduce a 1996 memorandum explaining why the State was not prosecuting Kowalski for Perry's death*

Kowalski's second claim on appeal relates to the trial court's decision to exclude evidence of a 1996 screening memorandum written by then-assistant district attorney Richard Svobodny. In this memorandum, Svobodny summarizes the evidence from the 1996 investigation and provides his own assessment of whether the State could prove that the shooting was a criminal act beyond a reasonable doubt. (Because a copy of the memorandum was given to Perry's family, the memorandum did not qualify as attorney work product.)

The trial judge denied Kowalski's request to introduce the memorandum on several grounds. The judge ruled that the memorandum was inadmissible hearsay. The judge also ruled that, even if the memorandum fell within an exception to the hearsay rule, it should be excluded under Evidence Rule 403 because any probative value it had was greatly outweighed by the risk of unfair prejudice and confusion of the issues. The judge noted that, to the extent the memorandum described the evidence

pertaining to the 1996 shooting, it was cumulative of the evidence that would be presented through other means at Kowalski's trial. And to the extent that the memorandum contained Svobodny's personal evaluation of the evidence (as it stood in 1996), the memorandum had only marginal value and was likely to be confusing to the jurors, whose duty was to evaluate that evidence independently.

On appeal, Kowalski argues that the trial judge was wrong to exclude this memorandum on hearsay grounds. Kowalski argues that the memorandum qualified as an admission of a party opponent and was therefore admissible under Alaska Evidence Rule 801(d)(2).[18] In support of this claim, Kowalski cites several decisions from other jurisdictions where memoranda written by prosecutors or other government officials were deemed out-of-court statements of a party opponent.[19]

---

[18] *See United States v. Kattar*, 840 F.2d 118, 130 (1st Cir. 1988) ("the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases") (quoting *United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978)).

[19] *See, e.g.*, *United States v. Salerno*, 937 F.2d 797, 811-13 (2d Cir. 1991) (concluding that opening statements from prior cases can, under some circumstances, be admissible as statements of a party opponent); *United States v. Van Griffin*, 874 F.2d 634, 638 (9th Cir. 1989) (concluding that a government pamphlet explaining sobriety testing procedures was an admissible statement of a party opponent); *Kattar*, 840 F.2d at 130-31 (concluding that a sentencing memorandum and brief submitted by the Department of Justice in other cases were admissions by a party opponent); *Freeland v. United States*, 631 A.2d 1186, 1191, 1194 (D.C. App. 1993) (concluding that statements from an Assistant United States Attorney in a memo attached to a pretrial motion regarding the defendant's availability for trial were admissible as statements by a party opponent); *Bellamy v. State*, 941 A.2d 1107, 1113, 1117 (Md. App. 2008) (concluding that statements in a prosecutor's proffer from a prior case were admissible as statements made by a party opponent because: (1) the statements "unequivocally manifested an adoption of or belief in [the defendant's] statement" during the plea hearing; and (2) prosecutors were acting as the authorized agents of the state); *State v. Worthen*, 765 P.2d 839, 843, 848 (Utah 1988) (concluding that a letter from a prosecutor to the trial judge indicating that the state had no evidence tending to show who inflicted

(continued...)

However, as Kowalski acknowledges, these decisions all involve statements made by a prosecutor in court pleadings or statements made in open court while pursuing criminal prosecutions. We therefore question the value of these decisions in the context of Kowalski's case, where the prosecutor's memorandum was provided to the victim's family but was not filed in court.

In any event, we need not reach the question of whether the memorandum was admissible under the hearsay rules, because we conclude that the trial court did not abuse its discretion when it excluded this evidence under Evidence Rule 403.

As the trial judge recognized, the type of personal opinion embodied in Svobodny's memorandum is rarely admissible at a criminal trial. Prosecutors and police officers are generally not allowed to offer their personal opinions as to the strength of the evidence, the significance of the evidence, or the proper verdict in a criminal case.[20]

Kowalski contends that his case is different — that Svobodny's personal evaluation of the 1996 evidence was directly relevant because Svobodny (unlike the jury) was able to review the evidence from 1996 that had since been destroyed. But the jury was aware that this evidence had been destroyed, and the jury was instructed under *Thorne* that it was to presume that the destroyed evidence would have been beneficial to Kowalski. The jury was also aware that the Department of Law's original decision not to prosecute Kowalski was based, in part, on this destroyed evidence. And to the extent that Svobodny's memorandum described real or potential deficiencies in the 1996

---

[19] (...continued)
physical abuse on a victim was a statement by a party opponent).

[20] *See*, *e.g.*, *Grandstaff v. State*, 171 P.3d 1176, 1201-02 (Alaska App. 2007); *Noel v. State*, 754 P.2d 280, 283 (Alaska App. 1988); *Patterson v. State*, 747 P.2d 535, 538 (Alaska App. 1987).

evidence, Kowalski's attorney was free to highlight these same deficiencies at trial (which the record shows he did).

Given the trial judge's decision to give the jurors a *Thorne* instruction, and given the substantial risk that admission of the memorandum would lead to jury confusion and the needless presentation of cumulative evidence, we conclude that the trial judge did not abuse his discretion when he excluded the memorandum under Evidence Rule 403.

*Our independent review of the unredacted emails submitted to the trial court for in camera review*

On appeal, Kowalski requests that this Court review various unredacted State emails that the trial court reviewed *in camera* and provided to Kowalski with redactions. We have independently reviewed these emails and compared them to the redacted versions that were later given to the defense. Based on our review, we have confirmed that the redacted portions of the emails constitute information that is protected as attorney work product and was therefore not discoverable to the defense.[21] We therefore conclude that the redactions were appropriate and that the defense was provided with all of the non-privileged information that it had requested.

*Conclusion*

The judgment of the superior court is AFFIRMED.

---

[21] *See* Alaska R. Civ. P. 26(b)(3).