**Christopher Erin ROGERS Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10635.**

Court of Appeals of Alaska.

June 15, 2012.

**29.**   *Valley Hosp.,* 116 P.3d at 587.

Hanley Rebecca Smith, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and John J. Burns, Attorney General, Juneau, for the Appellee.

Before: MANNHEIMER and BOLGER, Judges, and ANDREWS, Senior Superior Court Judge.*

## OPINION

BOLGER, Judge.

Christopher Erin Rogers Jr. was convicted of first-degree murder, two counts of attempted first-degree murder, and several related crimes, after he confessed to shooting three people in Anchorage over several days in early December 2007, killing one person and seriously injuring two others. At trial on these charges, Rogers's attorney conceded that Rogers shot and wounded the third victim and stole his car, but he argued that Rogers had falsely confessed to the other two shootings, including the murder. The jury rejected this defense and convicted Rogers of most of the crimes with which he was charged.

On appeal, Rogers argues that the trial court violated his due process right to present a defense to the charge of murder by preventing him from offering evidence that another purportedly similar shooting took place in the same neighborhood a month earlier. Rogers argues that evidence of this other shooting was relevant and admissible to cast doubt on his guilt, because the evidence suggested that someone else might have committed both crimes. He also argues that the trial judge committed legal error by relying on the strength of the prosecution's evidence that he committed the charged murder to exclude the evidence of the earlier shooting. We conclude that the trial judge's analysis was not flawed, and that he did not abuse his discretion by excluding this evidence.

Rogers also argues that the prosecutor engaged in improper argument. We conclude that the prosecutor's arguments were either proper, or that Rogers failed to show that they affected the fairness of his trial. We therefore affirm Rogers's convictions.

### Background

On December 2, 2007, Rogers attacked his father and his father's fiancée with a machete at their home in Palmer, killing his father and seriously injuring his fiancée. Rogers then took his father's truck, a revolver, and ammunition, and drove to Anchorage. He abandoned the truck at a gas station and walked to a residential neighborhood in Spenard, where he shot Jason Wenger as he was warming up his Ford Bronco in his driveway. Rogers testified that he intended to take Wenger's truck, but that he fled after Wenger yelled and revved his engine. Wenger was later discovered by a neighbor who was walking his dog. He had eight gunshot wounds to his body. Two bullets were matched to Rogers's revolver.

That evening, Rogers encountered Elizabeth Rumsey in the Westchester Lagoon area as she walked home from the Bear Tooth Theater Pub. Rogers asked Rumsey

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

for the time, and then shot her multiple times because he was concerned she had recognized him and would call the police. Rumsey was seriously injured but survived the attack. She described her attacker as white, very thin, taller than six feet, with a moustache and either a hood or ponytail, and wearing dark clothing. A bullet recovered from her clothing was matched to Rogers's revolver.

Early the next morning, Rogers shot Tamas Deak six times as he was getting into his Jeep Cherokee to go to work. He also hit Deak on the head with the butt of his revolver. Like Rumsey, Deak was seriously injured, but survived. Two of the bullets recovered from the shooting were matched to Rogers's revolver. Deak described his assailant as very thin, bearded, and dressed in a dark blue jumpsuit with a hood. He told the police his attacker had taken the Jeep and driven west.

The police soon spotted Deak's vehicle as it was preparing to turn onto DeBarr Avenue. After a brief pursuit, the police rammed the vehicle, pinned it between a power pole and a tree, and apprehended Rogers. When questioned by the police, Rogers admitted that he intended to shoot the three victims. He also said he tried to shoot the police officers who apprehended him, but that his gun malfunctioned. He told the police that aliens had ordered him to kill as many people as possible.

Rogers was charged with first-degree murder[1] and first-degree robbery[2] for his attack on Jason Wenger. He was charged with attempted first-degree murder,[3] first-degree robbery, and first-degree vehicle theft[4] for his attack on Tamas Deak. He was charged with attempted first-degree murder and first-degree assault[5] for shooting Elizabeth Rumsey. He was also charged with the attempted first-degree murder of an Anchorage police officer, failure to stop at the direction of a police officer,[6] and first-degree

weapons misconduct (for using a weapon while operating a vehicle).[7] Rogers was tried separately in Palmer for the crimes involving his father and his father's fiancée.

Rogers's main defense at trial was that his confession to the police was not credible. His attorney conceded that Rogers shot Deak and stole his vehicle, which he was driving when he was apprehended. But the attorney challenged the ballistics evidence tying Rogers to the Wenger and Rumsey shootings, and he argued that Rogers had falsely confessed to those shootings because of the guilt he felt for killing his father. Rogers took the stand at trial, apparently against his attorney's advice, and again admitted to all of the shootings, though he said he lied to the police when he claimed he intended to kill the victims. He also recanted his earlier admission that he attempted to kill police officers at the scene of his arrest. In closing argument, Rogers's attorney contended that Rogers's trial testimony was his attempt to commit "suicide by jury."

During the trial, Rogers's attorney sought to present evidence of a purportedly similar, drug-related murder that took place several blocks from the Wenger shooting about a month earlier to support his claim that someone else killed Wenger. Superior Court Judge Eric A. Aarseth precluded this evidence, ruling that Rogers had not established a sufficient connection between the two shootings to make evidence of the earlier shooting admissible as other-suspect evidence.

After the prosecutor's final arguments, Rogers moved for a mistrial, arguing that the prosecutor had made improper remarks that prejudiced the fairness of his trial. The court denied the mistrial motion and Rogers's request for a curative instruction.

The jury convicted Rogers of all of the charges related to the Wenger, Deak, and Rumsey shootings. The jury also convicted

1. AS 11.41.100(a)(1)(A).

2. AS 11.41.500(a)(1).

3. AS 11.41.100(a)(1)(A); AS 11.31.100.

4. AS 11.46.360(a)(1).

5. AS 11.41.200(a)(2).

6. AS 28.35.182(a).

7. AS 11.61.190(a)(2).

Rogers of failure to stop at the direction of a police officer. The jury acquitted Rogers of attempted first-degree murder of an Anchorage police officer, and of the related weapons charge. Rogers appeals.

### Discussion

#### The trial judge properly excluded the other-suspect evidence.

As just explained, Judge Aarseth prevented Rogers from introducing evidence that a drug-related murder took place about a month earlier several blocks from where Wenger was killed. Rogers argued that evidence of the earlier murder should be admitted as evidence that someone other than Rogers committed both crimes because the two murders took place relatively close in time and place, witnesses reported seeing a light-colored sedan at the scenes of both crimes, and there was reportedly a drug house in Wenger's neighborhood. To support this argument, Rogers made an offer of proof that a witness to the earlier shooting had observed two people—including a tall man carrying a rifle and wearing dark, Carhartt-type work clothes—leave the scene in a light-colored sedan. Rogers also made an offer of proof that the Anchorage police had information that light-colored vehicles were observed at the scenes of both crimes. Judge Aarseth found that the connection between the two murders was too speculative for evidence of the earlier murder to be relevant, and that evidence of the earlier shooting did not raise a reasonable doubt about Rogers's guilt.

Rogers argues that this ruling violated his due process right to present a complete defense.[8] He also argues that the trial judge committed legal error by excluding this evidence based in part on the strength of the prosecution's case.

■ Although a defendant has a due process right to present a defense, that right is limited by considerations of relevance and materiality.[9] The Alaska Supreme Court has held that a trial court's evidentiary rulings must not "substantially infringe" on the defendant's right to present a defense.[10] When a defendant wishes to present evidence and argument implicating another person in the commission of an offense, "evidence of the third party's guilt is admissible only if the defense can produce evidence that 'tend[s] to directly connect such other person with the actual commission of the crime charged.'"[11] This limitation on other-suspect evidence is aimed at ensuring that the jury is not unduly distracted from the central issues of the case.[12]

The Alaska Supreme Court has provided some guidance on the type of evidence required to "directly connect" another suspect to the commission of the charged crime. In *Marrone v. State,* the court ruled that evidence that another person had threatened the victim was not sufficient, standing alone, to admit other-suspect evidence.[13] Marrone was charged with killing the proprietor of an Anchorage night club.[14] At trial, he sought to introduce evidence that earlier, in California, a man identified as "Little Joe" had threatened to "get" the decedent.[15] Marrone intimated that "Little Joe" might have been the unknown "Joe" seen at the night club shortly before the victim was shot.[16] The supreme court affirmed the trial court's decision to exclude this evidence, observing that there was "no evidence in the record to connect 'Little Joe' with the 'Joe' described by the defendant, let alone evidence to connect 'Little Joe' with the commission of the

---

**8.** U.S. Const. amend. V; Alaska Const. art. 1, § 7.

**9.** *Smithart v. State,* 988 P.2d 583, 586 (Alaska 1999); *Marrone v. State,* 359 P.2d 969, 984 n. 19 (Alaska 1961).

**10.** *Smithart,* 988 P.2d at 586.

**11.** *Id.* (quoting *Marrone,* 359 P.2d at 984 n. 19).

**12.** *See id.* at 586–87 (citing *Marrone,* 359 P.2d 969).

**13.** 359 P.2d at 984.

**14.** *Id.* at 971.

**15.** *Id.* at 984.

**16.** *Id.*

crime charged."[17] The court declared that "threats by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime."[18]

In *Smithart v. State*, the supreme court ruled that there were sufficient direct connections between the alternative suspect and the charged crime to admit evidence and argument implicating the other suspect.[19] In *Smithart*, the defendant made an offer of proof that the other suspect—who appeared as a witness for the State—had been at the scene of the child victim's disappearance; that the shop in which the suspect worked was a plausible source of the paint chips and metal fragments found on or near the victim's body; that the suspect delayed coming forward with his identification of Smithart and lied about his own whereabouts when the victim disappeared; and that the suspect was a convicted felon who illegally possessed firearms in violation of his probation, including firearms similar to that used to shoot the victim.[20]

The supreme court concluded that the trial court had viewed the direct-connection requirement of *Marrone* too narrowly when it excluded this evidence on the ground that it did not sufficiently implicate the other suspect in the charged crime.[21] The proper question, the supreme court declared, was whether the other-suspect evidence "links the crime to the third party in a way that tends to create doubt about the defendant's guilt"—not whether the evidence tended to establish the guilt of the third party.[22]

▪ In this case, Rogers sought to admit evidence that, about a month before Wenger was killed, there was another shooting several blocks away, and that witnesses at the scenes of both crimes described a light-colored sedan and a tall man dressed in dark,

Carhartt-like clothing. These common attributes are not distinctive enough to support a reasonable inference that both crimes were committed by the same person or persons. As Judge Aarseth observed, light-colored cars are common, and many people wear dark clothing in the winter in Anchorage. Nor is it unusual for a man to be described as tall.

Furthermore, as the State points out, there were significant differences between the two incidents. The earlier shooting was apparently a drug-related robbery, and Rogers conceded there was no evidence Wenger was involved in drugs. A witness at the scene of the earlier shooting observed a man carrying a rifle, and Wenger was killed with a revolver. There were two people observed leaving the scene of the earlier shooting, a man and a dark-skinned woman, but only one person in dark clothing was seen near the Wenger shooting. A small white or silver sedan was observed speeding away from the Wenger shooting, while the witness at the earlier shooting observed a full-size, police cruiser style vehicle like a Chevrolet Caprice.

In *Wright v. State*, an unpublished case, we upheld the trial court's decision to exclude evidence of a convenience store robbery that took place fifteen months before the charged offense in the same city, which the defendant had offered as other-suspect evidence.[23] We agreed with the trial judge that there was not sufficient reason to believe both murders were committed by the same person or persons just because both crimes involved convenience-store clerks who were killed by gunshots to the head on a holiday weekend.[24] Other courts have likewise excluded evidence of other similar crimes that shared only generic characteristics with the charged offense. For instance, in *State v. Mosby*, the Supreme Court of Louisiana upheld the exclusion of evidence of several robberies that shared basic similarities with the charged

---

17.  *Id.* at 985.

18.  *Id.* at 984.

19.  988 P.2d at 589.

20.  *Id.* at 587.

21.  *Id.* at 587–88.

22.  *Id.*

23.  Mem. Op. & J. No. 5659, 2010 WL 5273014, at *3–4 (Alaska App. Dec. 15, 2010).

24.  *Id.* at *4.

robbery—all of the crimes were committed by slender black males and occurred during the morning banking hours at banks in the same general area of the city.[25] The Louisiana court noted that this kind of robbery was "not unusual" in an urban area.[26] And in *United States v. Seals*, the Seventh Circuit upheld the exclusion of evidence of a bank robbery that took place two weeks after the charged bank robbery, even though, like the charged offense, the robbery was committed by a group of armed black men wearing disguises who fled in a getaway car.[27] The court noted that these characteristics described many bank robberies, and the two robberies differed in other ways—the robbers employed different firearms, disguises, and a different modus operandi.[28] The fact that a detective involved in the case initially believed the robberies appeared similar did not change this analysis.[29]

We conclude that Judge Aarseth did not err by ruling that the connection between the two shootings in Wenger's neighborhood was too speculative to raise a reasonable doubt about Rogers's guilt. The judge therefore did not abuse his discretion by excluding evidence of the earlier shooting under *Smithart–Marrone*.

Rogers's next claim is that Judge Aarseth committed legal error by excluding the other-suspect evidence based in part on the strength of the State's case against him. He relies on the United States Supreme Court's decision in *Holmes v. South Carolina*, which struck down a South Carolina rule excluding alternative-suspect evidence in cases in which the government submitted strong evidence of the defendant's guilt.[30] The Court held that the South Carolina rule was arbitrary and violated Holmes's right to present a complete defense because the rule did not focus on the probative value or potential adverse effects of admitting evidence of third-party guilt, but instead made the critical inquiry the strength of the state's case—with little, if any, examination of the credibility or reliability of the state's evidence.[31]

Rogers's reliance on *Holmes* is unpersuasive. In *Holmes*, the Supreme Court distinguished the South Carolina rule from "widely accepted" rules that prohibit the admission of other-suspect evidence that is too speculative or remote, or not relevant to any material fact.[32] The Court listed cases that adhered to this constitutionally acceptable approach—including the Alaska Supreme Court's decision in *Smithart*.[33]

■ Judge Aarseth's analysis focused on whether the two murders were similar enough to establish a "real connection" between the alternative suspect and the charged offense, and he concluded that they were not. Only then did he consider the other-suspect evidence in the context of the State's proof—in particular, Rogers's confessions and the ballistics evidence. The judge concluded that the other-suspect evidence was "too speculative, too distant in nature to be of relevance" and "could not create reasonable doubt in this case." This analysis did not run afoul of *Holmes*. As a California court of appeals has explained:

[*Holmes* ] dealt with a judicially created rule precluding third party culpability evidence if the prosecution presented strong evidence, especially forensic evidence.... *Holmes* did not consider the extent to which a trial court might consider the strength of the prosecution's evidence in exercising its discretion to determine whether the third party evidence could raise a reasonable doubt as to the defendant's guilt.[34]

**25.** 595 So.2d 1135, 1140 (La.1992).

**26.** *Id.*

**27.** 419 F.3d 600, 603, 607 (7th Cir.2005).

**28.** *Id.* at 607.

**29.** *Id.*

**30.** 547 U.S. 319, 328–31, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

**31.** *Id.* at 329, 126 S.Ct. 1727.

**32.** *Id.* at 327, 126 S.Ct. 1727.

**33.** *Id.* at 327 n. *, 126 S.Ct. 1727.

**34.** *People v. Samaniego*, 172 Cal.App.4th 1148, 91 Cal.Rptr.3d 874, 896–97 (2009).

We find no error in Judge Aarseth's analysis of this issue, and conclude that Rogers has not shown that the judge's decision to exclude evidence of the earlier shooting substantially infringed his right to present a defense.

*Rogers is not entitled to reversal of his convictions because the prosecutor made an improper closing argument.*

We have previously held that it is improper for a prosecutor to express a personal belief on the evidence or to make appeals calculated to inflame the passions and prejudices of the jury.[35] Rogers argues that the prosecutor engaged in this kind of misconduct by calling him, among other things, a murderer, a liar, and a heartless, callous man. He asserts that these remarks were not reasonable inferences from the evidence, that the prosecutor used them to inject her personal opinion into the argument, and that the only purpose of the remarks was to discredit and demonize him before the jury.

With the exceptions noted below, Rogers did not object to these comments in the superior court. Therefore, he must show that Judge Aarseth committed plain error by not admonishing the prosecutor, instructing the jury to disregard her remarks, or declaring a mistrial, even though Rogers did not request this relief at his trial.[36]

■ When a defendant argues that a prosecutor's argument amounted to misconduct, we consider "whether the prosecutor's statements, if in error, constituted such egregious conduct as to 'undermine the fundamental fairness of the trial.'"[37] In this analysis, we view the challenged statements in the context of the record as a whole.[38]

*The prosecutor's assertions that Rogers lied*

■ Rogers argues that the prosecutor impermissibly suggested that he lied in his trial testimony. He points in particular to these remarks in the State's closing argument:

The defendant wants you to believe he is either crazy or a liar when, in fact, he is just a murderer. Ladies and gentlemen, the question before you is not whether Erin Rogers lied at some point during a statement or during testimony in this case; most people who do reprehensible things often sprinkle distortions into the things that they say to minimize or explain or somehow rationalize the things they've done.

Rogers also points to the prosecutor's insinuation that he lied when he testified that he spoke to Wenger before shooting him. Rogers testified that he told Wenger he wanted his truck and only shot Wenger in a panic because it looked like Wenger was reaching for a gun. Rogers said he lied when he told the police he intended to kill Wenger. In closing argument, the prosecutor suggested that Rogers fabricated this conversation with Wenger to make himself appear less "mean-spirited and culpable."

■ It is not plain error for the prosecutor to assert that the defendant is a liar when that argument is based on the evidence.[39] Rogers confessed to all three shootings, telling the police he intended to kill Wenger, Rumsey, and Deak. At trial, he took the stand and denied that he intended to kill the victims. The prosecutor's remarks offered the jury an explanation for this discrepancy: that Rogers lied in his testimony at trial to make himself appear less culpable.

This argument responded directly to the defense case. Because Rogers claimed someone else shot Wenger and Rumsey, the attorney's argument hinged on convincing the jury that Rogers lied in his confession to

**35.** *Patterson v. State,* 747 P.2d 535, 538 (Alaska App.1987) (citing 1 Am. Bar Ass'n, *Standards for Criminal Justice* § 3–5.8(e) (2d ed. 1982)).

**36.** *See Cook v. State,* 36 P.3d 710, 729 (Alaska App.2001).

**37.** *Potts v. State,* 712 P.2d 385, 390 (Alaska App. 1985), *superseded by statute on other grounds as*

*recognized in Braun v. State,* 911 P.2d 1075, 1078 (Alaska App.1996) (quoting *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

**38.** *Patterson,* 747 P.2d at 541.

**39.** *See Smith v. State,* 771 P.2d 1374, 1379 (Alaska App.1989).

the police and in his trial testimony when he admitted to the shootings. In his opening statement, Rogers's attorney said the "lynchpin" of the State's case was Rogers's confessions. He pointed out that "the truth [the State is] asking you to believe is coming from someone who is telling you that aliens made him do it." "So which is it?" the attorney continued. "Aliens or a self-destructive lie?" "[Y]ou are left very likely at the end of this case with the conclusion that aliens was a lie and with that lie you maybe need to think about the other things that Christopher Erin Rogers [said]."

Rogers's attorney continued on this theme in closing argument: "Clearly, Mr. Rogers is not an accurate reporter of objective reality"; "[H]e's testifying to you to things that are obviously completely wrong"; "You cannot look one another in the eye and say that that man is [an] accurate reporter of objective reality, and that's what the State is asking you to do."

Viewed in the context of this defense, the prosecutor's remark that Rogers "sprinkle[d] distortions" in his statements was clearly not aimed at branding Rogers as a liar, or at injecting the prosecutor's personal opinion that he was a liar; the State's case depended on the jury finding that Rogers's admissions were, in large part, credible. Rather, the prosecutor's remarks were aimed at explaining to the jury why it should believe Rogers's confessions to the police but disbelieve his later testimony minimizing his culpability for the crimes. This was proper argument—particularly given that Rogers made his credibility a central issue in the case.

■ Rogers also complains that, in rebuttal argument, the prosecutor displayed a slide in her PowerPoint presentation entitled "You Don't Get to Make Things Up," and another slide suggesting that Rogers had fabricated his story that aliens ordered him to kill people. This was also proper argument. Rogers's attorney stated more than a dozen times in his final argument that the State had "made up" evidence in its closing argument and that it was not permissible to "make things up." The State did not commit

misconduct by using this same rhetorical device to argue that the defense attorney distorted the evidence in his closing argument. Although a defense counsel's attacks do not give the prosecutor license to make improper arguments, reversal is not warranted if the prosecutor's remarks do "no more than respond substantially in order to 'right the scale.' " [40]

The State's slide asserting that Rogers made up his story that aliens forced him to shoot people was also not improper. The defense attorney ridiculed Rogers's statements about aliens in an effort to discredit Rogers's confessions. The State, for its part, argued that Rogers's claim that he had been coerced by aliens did not hold up under police questioning, and that his real motivations for the killings could be found in his statements conveying his anger toward his father and his fiancée, who were his first victims. These were reasonable inferences from the evidence.

In his reply brief, Rogers argues that the State's remarks urging the jury to believe some of Rogers's statements and to disbelieve others "did damage to the defense theory." But Rogers cites no case law holding that it is permissible for the defense attorney to attack the defendant's credibility on central issues, but that it is impermissible for the prosecutor to do so. We find no plain error.

*The prosecutor's assertions that Rogers was callous and a murderer*

Rogers next argues that the prosecutor committed misconduct by making ad hominem attacks on him, inviting the jury to base its decision on factors outside the record. Specifically, Rogers points to the prosecutor's remarks that he was a "murderer" and a "callous, heartless, angry man." Rogers also points to the prosecutor's statements characterizing his attitude as "devil-may-care," and his motivation as "the thrill of the kill."

■ The references to Rogers as a "murderer" occurred in the prosecutor's rebuttal

**40.** *Young,* 470 U.S. at 12–13, 105 S.Ct. 1038.

argument. The prosecutor began that argument by stating:

> The defendant wants you to believe he is either crazy or a liar when, in fact, he is just a murderer.... [Y]ou don't have to decide [whether he is crazy or a liar]; what you have to decide is whether or not Erin Rogers is a murderer[,] and that's the verdict that you will render today.

The primary danger in argument that conveys the prosecutor's opinion as to the guilt of the defendant is that "it may suggest to the jury that the prosecutor has information, not disclosed at trial, conclusively establishing the defendant's guilt." [41] Such argument has the potential to "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." [42]

The prosecutor's brief references to Rogers as a "murderer" did not present these dangers. Viewed in context, the remarks did not convey the prosecutor's personal opinion that Rogers was a murderer; rather, the comments were aimed at encouraging the jury to focus its inquiry on whether Rogers was guilty of murder, rather than on the subsidiary issues emphasized by the defense—Rogers's credibility and sanity. Moreover, shortly after the prosecutor referred to Rogers as a "murderer," she underscored that it was the jury's job to decide his guilt, stating, "[W]hat you have to decide is whether or not Erin Rogers is a murderer." The prosecutor's remarks were isolated and not so inflammatory that they were likely to lead the jury to decide the case based on improper factors—particularly given that Rogers had confessed to the shootings.

Rogers also argues that the prosecutor acted improperly by calling him a "callous, heartless, angry man" in her opening statement, and by suggesting in closing argument that Rogers might have been motivated by the "thrill of the kill." The prosecutor began her opening statement as follows:

> Our town, Anchorage. It's not a big city. For most of us it's just a town.... It's a town which ... has its share of crime, but for the most part each one of us feels in our town utterly safe.
>
> ... For Tamas Deak, Elizabeth Rumsey and the family of Jason Wenger, that illusion was shattered on a pair of December mornings in 2007. That sense of safety for them was destroyed when a callous, heartless, angry man came in from the Valley and first took the life of Jason Wenger and then tried to take the lives of Tamas Deak, Elizabeth Rumsey, and an Anchorage Police Department officer.
>
> Ladies and gentlemen, the anger that you're going to hear about, the hate that you're going to get to witness during the course of this trial, came from a callous devil-may-care attitude that fueled the conduct of that man ... Erin Rogers.

The prosecutor's other comment came during her closing argument:

> "Why" is not an element of the offense. "Why" is not something that the government has to prove. "Why" is not something that you yourself would ever come to one decision about. There may be lots of reasons why ... the Anchorage crimes were committed. Could be just self-preservation.
>
> It could be the thrill of the kill, and I apologize if that ... offen[ds] somebody's sensibility, but that might resonate with some of you, that this was a devil-may-care flight, and if somebody took him out at the end, he didn't—the defendant said, "I don't give two squirts about that." That was his attitude on the day that he was apprehended.

In his confession to the police, Rogers admitted that he intended to kill Wenger and take his truck. When asked how he felt about shooting Wenger, Rogers said he wished he had shot Wenger in a way that had allowed him to take the vehicle. He also calmly explained how he used a machete to attack his father and his father's fiancée. He showed no obvious emotion when he learned

---

**41.** *Potts,* 712 P.2d at 391.

**42.** *Id.* at 392 (quoting *Young,* 470 U.S. at 18–19, 105 S.Ct. 1038).

that his father had died in the attack. When asked if he felt sorry for what he had done, or if he had regrets, Rogers said he wished he had used a gun rather than a machete to attack his father and his father's fiancée because it would have been faster and easier. Rogers also expressed a lot of anger toward his father and his father's fiancée, calling his father's fiancée "cruel," "mean," and a "bitch," and calling his father a "fucking asshole" who was "always out for himself."

In his testimony at trial, Rogers recognized how callous he appeared in his statement to the police. He testified that he "didn't really want to kill anybody" and that he had lied to the police in his "whole attitude about really wanting to do it." He said he was not honest in the "cocky shithead way" he described the killings to the police, and in "saying things so matter of factly, just cocky and rude. That's not really how I felt." He went on: "I seemed like a really cold-hearted dickhead about ... a lot of things that happened.... I had a so-what attitude."

■ Given this record, it was not plain error for the prosecutor to call Rogers a "callous, heartless, angry man." Although the jury could have rejected this characterization of Rogers, there was ample evidence to support it—as Rogers conceded in his testimony.[43]

The same is true of the prosecutor's assertion that Rogers had a "devil-may-care" attitude. Rogers did object to this characterization at trial. But the court allowed the remark, apparently agreeing with the prosecutor's argument that "everybody understands the colloquial [meaning of] 'devil-may-care,' you know, in for a penny, in for a pound, here I go." Rogers has not argued that this phrase means something different.

Rogers essentially admitted to a "devil-may-care" attitude when he testified that he expressed a "so-what attitude" in his interview with the police, and that he came off as a "cold-hearted dickhead" when he described the killings. Given this record, the court did

not abuse its discretion by allowing this argument.

There is no direct evidence suggesting that Rogers was motivated by the "thrill of the kill." Nor did the prosecutor argue, or express her opinion, that this was Rogers's motivation. Rather, the prosecutor argued that there "may be lots of reasons" to explain Rogers's killing spree, including "self preservation" or "thrill of the kill." Rogers has not shown that permitting this argument was plain error.

*The court did not abuse its discretion by refusing to grant a mistrial.*

Rogers argues that the prosecutor improperly appealed to the jurors' passions by suggesting that he would have continued to kill or injure people if he had not been apprehended by the police. This argument arises from a slide in the State's rebuttal PowerPoint presentation that indicated Rogers had "35 bullets left," and the following rebuttal argument:

Ladies and gentleman, don't be fooled into believing that absurd positions advocated during the defense closing somehow impact Mr. Rogers' culpability for the crimes that he actually committed. There are lots of reasons that folks commit crimes. We heard a number of them in this case. The defendant, whether fueled by anger or a thrill or voices or whatever his motivation might have been in Palmer, once he left Palmer he had nothing left to lose. He kept on going as long as he could. He kept on going. He expended a lot of rounds. And folks, he had thirty-five more bullets left. They were in his pockets. They were at the ready.

Rogers objected to the slide, and after the prosecutor completed her rebuttal, Rogers asked for a mistrial based on the remarks about the thirty-five bullets and other comments, discussed below, that he claimed disparaged his defense. Rogers argued that the "clear implication" from the reference to the thirty-five bullets was that "he was ready to continue going to do more, to break more laws, to do things, aren't we lucky we caught

---

**43.** *See Marrone,* 359 P.2d at 981 & n. 13 (holding that it was proper to refer to the defendant and his witnesses as "hoodlums" where that description was supported by the evidence).

him?" In the event the mistrial motion was denied, Rogers asked for an instruction "that these acts of misconduct should be held against the State." The court denied both requests.

The superior court ruled that the prosecutor's remarks about the thirty-five bullets were relevant to Rogers's state of mind:

> If it does prove to the jury that the defendant was ready to continue to commit crimes, it seems to me that's actually pretty strong evidence of his potential—not his potential, of his state of mind regarding the potential that he had an intent to kill a police officer at the scene, and so I don't think there's anything that is outrageous about commenting on it. It's actually the evidence that's in the case and it would be a fair conclusion for the jury to draw.

There was no dispute at trial that Rogers had a revolver with five bullets in it at the time he was apprehended. Any marginal relevance the additional thirty-five bullets had to Rogers's intent to shoot a police officer was probably outweighed by the argument's potential to distract the jury from its duty to decide the case impartially based on the evidence.[44] The clear implication from the prosecutor's argument was that Rogers intended to continue his shooting spree until he either ran out of bullets or was apprehended.

The State argues that evidence of the thirty-five bullets was admissible to show that Rogers's shootings were not accidental. But there was never any argument or evidence that the shootings were accidental. The only dispute with respect to Rogers's intent was whether he intended to kill his victims—not whether he intended to shoot them.

■ But even if the prosecutor's reference to the thirty-five bullets was improper, we conclude that the court did not abuse its discretion by denying the motion for mistrial on this ground because it is obvious that the evidence did not prejudice Rogers. The jury acquitted Rogers of the charge of attempting to kill a police officer. This acquittal demonstrates that the jury was not unduly swayed by the prosecutor's suggestion that Rogers intended to keep shooting until his ammunition was spent.

Rogers also argues that the prosecutor improperly disparaged his defense by characterizing it as "absurd," a "fiction," and a "smoke screen," and by arguing that the jurors should be "offended" by the suggestion by Rogers's attorney in closing argument that the police officers lied in their testimony.

■ Rogers objected to the prosecutor's remark that the jury should be "offended" by the defense assertion that the police officers lied in their testimony. Following that objection, the prosecutor clarified her comment:

> No one's here suggesting to you, ladies and gentlemen, that the defense isn't entitled to stand up and make an argument on behalf of the defendant. But if you find those arguments wanting, if you find those arguments unsupported by the evidence, if you find those arguments fly in the face of everything that you saw and heard in this case, yes, you are entitled to be offended by those.

Rogers objected again, but the objection was overruled. He later argued that the prosecutor's remarks supported his requests for a mistrial or a curative instruction.

On appeal, Rogers renews his claim that the prosecutor's argument that the jurors should be "offended" by the suggestion of Rogers's counsel that the police officers lied was an improper attempt to "bolster the police officers' testimony by suggesting that a criminal defendant never has a right to challenge inconsistencies in testimony." This claim fails in light of the prosecutor's clarifying remarks. Those remarks made clear that the defense was entitled to attack the State's case, and that the jury could reject the defense arguments if they were unsupported by the evidence. They also made clear that the prosecutor was not offering her personal assessment of the officers' credibility or relying on information that had not been presented as evidence at Roger's trial.[45]

---

**44.** *See United States v. Ayala–Garcia,* 574 F.3d 5, 8, 18 (1st Cir.2009).

**45.** *See Lampley v. Anchorage,* 159 P.3d 515, 521 (Alaska App.2007).

594

Rogers argues that the prosecutor's attacks on his defense as "absurd," "a fiction," and a "smoke screen" "served no other purpose than to delegitimize Rogers's attacks on the prosecution's evidence." This claim presents a closer issue. In *Williams v. State*, we addressed a plain error claim that the prosecutor engaged in misconduct by characterizing the defense as "red herrings" in final argument.[46] We found no plain error because "the challenged remark did not purport to disparage the legitimacy of any legal theory or defense asserted by Williams; rather, it was directed at the substance of Williams' testimony and amounted simply to an argument that Williams' version of events was not credible."[47]

In reaching that decision in *Williams,* we contrasted a Maine case, *State v. McDonald,* where the prosecutor characterized the defendant's claim that he was legally insane, because he committed the offense in an alcoholic blackout, as a "very common excuse."[48] The prosecutor also dismissed the evidence submitted by the defendant concerning his mental state as "red herrings" and "smoke screens."[49] In reversing the defendant's conviction, the Maine court declared that the prosecutor's remarks were "clearly designed to awaken in the jury a suspicion that the defenses were merely a subterfuge employed by the defendant to evade responsibility for his acts."[50]

In Rogers's case, the prosecutor was not simply challenging the credibility of Rogers's version of events when she characterized his defense as a "fiction" and a "smoke screen"; she argued that Rogers's attacks on the State's case were not legitimate defenses but rather distractions aimed at shifting the jury's focus from the real issues of the case to what (according to the prosecutor) were unfounded claims of police misconduct and irrelevant inconsistencies in the State's evidence. On the other hand, as we already

noted, the prosecutor also made clear that the defense had a right to attack the State's case in this manner—and that the jury should reject those arguments if they were not supported by the evidence.

The prosecutor's rebuttal came in response to defense argument repeatedly accusing the prosecutor of distorting the evidence, including on issues that could only be viewed as tangential—whether the police knew at the time they interviewed Rogers that he had been caught on a security video buying a beer at Brown Jug, whether Rumsey was wearing a hat at the time she was shot, or whether a particular officer arrived at the scene of Rogers's arrest first. Although the prosecutor no doubt spoke too strongly when she characterized Rogers's defense as "absurd" and a "fiction," there was nothing impermissible about her underlying point: that none of Rogers's attacks on the State's evidence undercut his culpability for the charged crimes.[51]

We conclude that Judge Aarseth did not abuse his discretion by denying Rogers's motion for a mistrial. We also conclude that the court acted within its discretion by denying Rogers's request to instruct the jury "that these acts of misconduct should be held against the State." Because Rogers has not shown that the prosecutor made any improper argument that undermined the fairness of his trial, we find no merit to his claim that his convictions should be reversed based on the cumulative prejudice of the prosecutor's remarks.

### Conclusion

We AFFIRM the superior court's judgment.

COATS, Chief Judge, not participating.

---

**46.** 789 P.2d 365, 369 (Alaska App.1990).

**47.** *Id.*

**48.** 472 A.2d 424, 425 (Me.1994); *Williams,* 789 P.2d at 369.

**49.** *McDonald,* 472 A.2d at 425.

**50.** *Id.* at 426.

**51.** *See People v. Hicks,* 101 Ill.App.3d 238, 56 Ill.Dec. 782, 427 N.E.2d 1328, 1331 (1981); *People v. Griggs,* 51 Ill.App.3d 224, 9 Ill.Dec. 324, 366 N.E.2d 581, 583 (1977).