*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHRISTOPHER SEEGANA HESS, | ) | Supreme Court No. S-16466 |
| | ) | |
| Appellant, | ) | Court of Appeals No. A-11425 |
| | ) | |
| v. | ) | Superior Court No. 3AN-11-10574CR |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| | ) | |
| Appellee. | ) | No. 7323 – December 21, 2018 |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Brooke Berens, Assistant Public Advocate, Anchorage, and Richard Allen, Public Advocate, Anchorage, for Appellant. Terisia K. Chleborad, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A jury convicted Christopher Hess of second and third degree assault. He appealed, arguing that the superior court committed plain error by not addressing

improper statements in the prosecutor's closing arguments. The court of appeals affirmed Hess's convictions and held that, although some of the prosecutor's statements were improper, they did not undermine the trial's fundamental fairness. Hess petitioned for hearing. We granted the petition and, finding plain error, reverse his convictions.

## II. FACTS AND PROCEEDINGS

### A. Facts

In September 2011 Anchorage police responded to a reported assault in progress at Patricia Hess's apartment. Officers found Patricia outside the apartment. She was extremely upset and appeared to be intoxicated. There was bruising on the front of her throat and the front of her pants was wet.

Patricia told one of the officers that she and her son, Christopher Hess, had argued and he had become angry. She said she struggled with him and he knocked her to the ground and began strangling her. Patricia said she lost control of her bladder while being strangled and almost blacked out, although she did not pass out.

The officers and a police dog entered the apartment looking for Hess. He was arrested after being found and bitten by the dog. Hess appeared intoxicated and when questioned, he denied strangling his mother. Officers took Hess to a hospital where he had surgery for the dog bite to his arm. The officers found Patricia's dentures, glasses, and a kitchen knife on the floor of the apartment.

### B. Trial

Hess was indicted for one count of second degree assault for strangling Patricia[1] and one count of third degree assault for recklessly placing her in fear of injury

---

[1] *See* AS 11.41.210(a)(1) (a person who, with intent to cause physical injury
(continued...)

with a dangerous instrument (his hands around her neck).[2] The case went to trial on both counts in August 2012.

The State called three witnesses: Patricia and two of the responding officers. Patricia testified that she did not remember much of what happened. She said she remembered drinking with Hess, becoming very drunk, and then walking home from the hospital. Patricia testified that it was "kind of like blackout" and that she remembered being in a patrol car, but could not remember meeting with police officers. Patricia said that she did remember having a sore neck the next day. On cross-examination Patricia testified that she had post-traumatic stress disorder (PTSD) after a sexual assault four years earlier. She stated that she took medication for the PTSD, as well as for depression, sleeplessness, pain, and high blood pressure. Patricia testified that the medicine made her bruise easily. She also said that when she was "stressed [she had] dissociation."

One of the police officers testified about his medical training — he testified that he had worked as an EMT before joining the police department — and what he had been taught were signs of possible strangulation. The signs included redness around the throat and neck, petechiae (small red spots caused by broken blood vessels in the eyes,

---

[1]    (...continued)
to another, does so by means of a dangerous instrument, commits the crime of assault in the second degree).

[2]    *See* AS 11.41.220(a)(1)(A) (a person who recklessly places another in fear of imminent serious physical injury by means of a dangerous instrument commits the crime of assault in the third degree); *see also* AS 11.81.900(15)(B) (defining "dangerous instrument" to include "hands or other objects when used to impede normal breathing or circulation of blood by applying pressure on the throat or neck or obstructing the nose or mouth").

hairline, or behind the ears), difficulty swallowing or breathing, and lost bladder and bowel control. The officer testified that Patricia had difficulty swallowing and appeared to have urinated on herself, but that he did not remember seeing petechiae or marks on her face. He testified that he had seen strangulation cases in which there were no petechiae. But he conceded on cross-examination that intoxication could cause people to urinate on themselves.

The other officer had interviewed Patricia and Hess at the scene. He testified that Patricia was intoxicated, upset, coughing a lot, and had bruises on her neck. He said that she seemed to be afraid of Hess and she said that he had strangled her after an argument. The officer testified that marks on Patricia's neck were consistent with finger marks but that he did not see any impression of a hand or fingers. He also stated that Hess was intoxicated, denied strangling his mother, and denied that his mother had almost passed out.

The defense presented four witnesses: Hess and three of Patricia's other family members. Each family member testified that Patricia had a reputation for untruthfulness and dishonesty. They testified that Patricia was even less truthful when drinking.

Hess testified that he lived with Patricia when she needed help managing her medical conditions, taking her medication, and taking care of household chores. He said that he was with his mother on the night of the alleged assault, but that he only remembered starting to drink in the afternoon and then waking up in the hospital after being bitten by a dog. He testified that he did not remember strangling his mother or putting his hands on her neck, and that he would never hurt his mother even if he was drunk. Hess said that his mother sometimes forgot to take her medication, exaggerated

things, and was a danger to herself. The prosecutor impeached Hess's testimony with his convictions for crimes of dishonesty.

The State's closing argument focused on meeting the State's burden of proof and rebutting the defense's theory. The prosecutor told the jury that the defense wanted the jury to assume that Patricia was "crazy" and not to be trusted. After discussing the elements of charges against Hess, the prosecutor argued that they were not "going to be the biggest point. The biggest point is who do you believe?" He continued:

> I warned you during my opening that the defense was going to go out of their way to make it look like the victim was crazy, to vilify the victim. And we talked about this in voir dire. In domestic violence crimes that's too often what happens. And if my demeanor was at any point in time less than professional, that's my frustration because this case isn't really about whether or not [Ms.] Hess is crazy. This case is about whether or not the defendant strangled his own mother, and that's the evidence that came in.

After briefly arguing that the evidence had shown beyond a reasonable doubt that Hess was guilty of the charged offenses, the prosecutor returned to whether Patricia was "crazy":

> Now, I understand Ms. Hess has been through a lot. You heard her testimony. And she is sympathetic, and I am [not] suggesting that you [should have] sympathy for her.[3] You're supposed to make this decision absent pity and prejudice or passion. You're supposed to be objective when you make this. And she paints a sympathetic figure, but think about the position she's in when the state calls her to the stand. Her whole family clearly is against this prosecution.

---

[3] The bracketed language was omitted from the trial transcripts, but the alterations were agreed upon by the parties as present in the audio recording.

They all came to the stand and called her a liar. Her own son got on the stand and had no problem saying she's crazy. And that's problematic, ladies and gentlemen, because you didn't really see any evidence that she was crazy.

He concluded by arguing Patricia's statements to the police were consistent with the physical evidence and that Hess's defense was not credible.

After discussing the State's burden of proof and the State's reliance upon Patricia's version of events, the defense questioned Patricia's credibility. Emphasizing that the State's case depended upon Patricia's credibility, the defense attorney responded to the prosecutor's comments about the defense's argument:

> [T]here was a characterization that we're vilifying the victim. Now, to say that she has mental health issues, to say that she confuses reality from fantasy is not to vilify her. . . . We don't know what she was perceiving. . . . [W]e know [] that she was not on her mental health medication and she was intoxicated.

The prosecutor returned to his vilification theme in rebuttal:

> [The defense attorney] says she is not vilifying the victim. She's not vilifying the victim. Maybe that's true and maybe that's not. We talked about it in voir dire. If she's not vilifying the victim, what she is suggesting is that someone who has had her teeth knocked out and been raped and is on medication can no longer ever be a victim. That's what she's suggesting to you, and that is what is offensive.
>
> It doesn't make her a liar because she's been victimized in the past.

He then argued that Hess had reasons to lie to the jury, and that he should not be believed because he had "no qualms about making out his mother to be this crazy invalid, this helpless creature." The prosecutor argued that, on the other hand, Patricia had no motive to lie even though she was reluctant to testify and "[c]learly she is involved in a family

that does not support her." Hess did not object to any of these statements as improper closing argument.

The jury convicted Hess on both counts.

## C.    Appeal

Hess argued for the first time in his brief to the court of appeals that the prosecutor's closing argument was improper. He acknowledged that he had not objected to the argument at trial, but he argued that the prosecutor's statements amounted to plain error under *Adams v. State*.[4]

The court of appeals concluded that although some of the prosecutor's arguments were improper, they did not rise to the level of plain error.[5] Relying upon its previous case of *Rogers v. State*,[6] the court made its determination "in the context of the record as a whole" and concluded that the improper remarks did not "rob [the trial] of its fundamental fairness."[7] The court did not address whether the improper remarks amounted to a constitutional violation.[8]

We granted Hess's petition for hearing, and, applying the correct plain error test and finding plain error, we reverse Hess's conviction and remand for a new trial.

## III.    STANDARD OF REVIEW

Appellate courts are authorized to notice plain errors or defects, even when

---

[4]    261 P.3d 758 (Alaska 2011).

[5]    *Hess v. State*, 382 P.3d 1183, 1185-87 (Alaska App. 2016).

[6]    280 P.3d 582 (Alaska App. 2012).

[7]    *Hess*, 382 P.3d at 1186-87.

[8]    *See id.*

not brought to the court's attention, when they affect substantial rights.[9]

## IV.  DISCUSSION

### A.  Alaska's Plain Error Test

We articulated the four-part test for plain error review in *Adams v. State*.[10] All four factors must be met to determine whether plain error occurred:

> (1) there must be error, and the error must not have been the result of an intelligent waiver or a tactical decision not to object; (2) the error must be obvious, meaning that it should have been apparent to any competent judge or lawyer; (3) the error must affect substantial rights, meaning that it must pertain to the fundamental fairness of the proceeding; and (4) the error must be prejudicial.[11]

The *Adams* test differs from the federal test because it imposes an additional step not required under federal law.  "[F]ederal plain error review is governed by a three-part test:  (1) there must be error, and the right at issue must not have been intentionally relinquished; (2) the error must be plain, meaning obvious; and (3) the error must affect substantial rights, meaning it must have affected the outcome of the proceeding."[12]

Unlike the inquiry required by the three-pronged federal plain error test, Alaska's standard separates the third prong into two steps.[13]  While federal appellate courts determine that an error affected substantial rights only when the error was

---

[9]     *Adams*, 261 P.3d at 764.

[10]    *Id.* at 773.

[11]    *Id.*

[12]    *Id.* at 772 n.72 (citing *United States v. Olano*, 507 U.S. 725, 732-35 (1993)).

[13]    *Id.*

prejudicial, we have interpreted the phrase " 'affect substantial rights' not to mean that the error was prejudicial, but instead to mean that the error pertains to an important right that could affect the fundamental fairness of the proceeding."[14]

Having determined that an error pertains to the fundamental fairness of the proceeding, the court must next determine whether the error was prejudicial.[15]  We explained in *Adams* how courts are to make that determination:

> A constitutional violation will always affect substantial rights and will be prejudicial unless the State proves that it was harmless beyond a reasonable doubt.  An error that is not constitutional in nature will be prejudicial if the defendant proves that there is a reasonable probability that it affected the outcome of the proceeding.[16]

Whether the error was of constitutional dimension thus establishes and assigns the burden of proof that must be met before the reviewing court can determine whether the error was prejudicial.  Contrary to the court of appeals' decision and its reliance upon *Rogers*, prejudice does not depend upon whether the error was "sufficiently central to the trial so as to rob it of its fundamental fairness."[17]

## B.    The Plain Error Test Applied To Hess's Case

We now examine the prosecutor's improper arguments under the *Adams* test.  No argument has been made that Hess either waived his objection to the improper

---

[14]    *Id.*

[15]    *Id.*

[16]    *Id.* at 773.

[17]    *Hess v. State*, 382 P.3d 1183, 1186-87 (Alaska App. 2016) (citing *Rogers v. State*, 280 P.3d 582, 589 (Alaska App. 2012)).

statements or made a tactical decision not to object. The first prong of the plain error test is satisfied.[18]

The second prong is satisfied when the alleged error is obvious.[19] The court of appeals found that the prosecutor's statements "improperly denigrated the defense lawyer's trial strategy by asserting that defense attorneys in general commonly engage in false 'vilification' of victims of domestic violence" and that "[t]he prosecutor was implicitly asking the jurors to reject Hess's defense, not because the defense lacked evidentiary support, but instead because of . . . his unsupported accusation that defense attorneys commonly resort to underhanded or misleading tactics."[20]

We agree that these arguments were improper. Both this court and the court of appeals have previously condemned similar arguments as prosecutorial misconduct and emphasized that closing arguments must be restricted "to the evidence presented at trial and the inferences that may fairly be drawn therefrom."[21] Alaska's Rules of Professional Conduct place upon all attorneys the ethical obligation not to "allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence" and forbid a lawyer from asserting personal knowledge or stating a personal opinion about the issues before the trier of fact.[22] Rule

---

[18]    *See Adams*, 261 P.3d at 773.

[19]    *Id.* at 773.

[20]    *Hess*, 382 P.3d at 1186.

[21]    *Patterson v. State*, 747 P.2d 535, 538 (Alaska App. 1987) (approvingly discussing STANDARDS FOR CRIMINAL JUSTICE § 3-5.8 (AM. BAR ASS'N 2d ed. 1982)); *see Adams*, 261 P.3d at 767-770, 774-75.

[22]    Alaska R. Prof. Conduct 3.4(e) (excluding times when the lawyer is a

of Professional Conduct 3.8 establishes special responsibilities for prosecuting attorneys; its accompanying commentary begins with the reminder that a prosecutor "has the responsibility of a minister of justice and not simply that of an advocate."[23] The American Bar Association's Criminal Justice Standard 3-6.8(c) reiterates these obligations, stating that "[a] prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact."[24] The comments in the closing arguments here attacking the defense attorneys and accusing Hess's counsel of vilifying the victim clearly violate these standards and were obvious error.

The third prong of the *Adams* test requires the reviewing court to determine whether the error "affect[ed] substantial rights, meaning that it . . . pertain[ed] to the fundamental fairness of the proceeding."[25] In *Adams* we concluded that the prosecutor's comments on the defendant's pre-arrest silence pertained to a substantial right because a defendant's pre-arrest silence is minimally probative and highly prejudicial.[26]

The prosecutor's comments here likewise affected important rights that could affect the fundamental fairness of the proceeding. The prosecutor suggested that the jury should consider his personal opinion of defense attorneys and Hess's defense

---

[22] (...continued)
witness).

[23] Alaska R. Prof. Conduct 3.8 cmt. 1.

[24] ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION & DEFENSE FUNCTION § 3-6.8(c) (AM. BAR ASS'N 4th ed. 2015).

[25] *See Adams v. State*, 261 P.3d 758, 773 (Alaska 2011).

[26] *Id.* at 774.

strategy.[27] The prosecutor's attack on the defense strategy and defense counsel was inappropriate, the comments were of no probative value, and they created a high potential for unfair prejudice.

The fourth prong of the *Adams* test requires the reviewing court to determine whether the error was prejudicial.[28] If an error affected a non-constitutional substantial right, the defendant must show "there is a reasonable probability that the error affected the outcome of the case."[29] In *Adams* we considered the following factors to determine whether the defendant had shown whether "there [was] a reasonable probability that the error affected the outcome of the case": the weight of the State's other evidence, whether the case "hinged primarily on [] conflicting testimony," whether the statements occurred during closing arguments, whether the comments were "express" versus "brief and passing," and whether the comments were "directly elicited by the prosecutor's questioning."[30] In *Goldsbury v. State* we recently restated that "prejudicial comments made during closing arguments are more likely to be prejudicial and less

---

[27]  *See Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) (discussing how prosecutorial attacks on defense counsel affect due process rights).

[28]  *Adams*, 261 P.3d at 773.

[29]  *Id.* at 774.

[30]  *Id.* at 774-75 (quoting *Van Hatten v. State*, 666 P.2d 1047, 1056 (Alaska App. 1983), abrogated by *Adams*, 261 P.3d at 773). We have noted that statements during closing arguments are more likely to be prejudicial because of concerns about the effectiveness of objections made during final arguments. *Id.* "The prejudicial comment is before the jury before the objection can be made, and the curative effect of an admonition of the court to disregard the comment is of debatable value." *Id.* at 775 (quoting *Dorman v. State*, 622 P.2d 448, 458 (Alaska 1981)).

likely to be mitigated by curative instructions than are comments made during other parts of a trial."[31]

The same considerations that led us to conclude that the error in *Adams* was prejudicial are present here.[32] The prosecutor made several separate comments attacking the defense. He made them both during his initial closing argument and again during rebuttal. The trial court did not give a curative instruction. The improper statements went directly to the defense's theory of the case and aimed to discredit the defense attorney as well as her argument. Finally, as in *Adams*, the State's case depended largely on conflicting witness testimony.[33] As a result "there is a reasonable probability that the error affected the outcome of the case."[34]

## V.    CONCLUSION

Because the prosecutor's improper statements during closing arguments were plain error, we REVERSE Hess's convictions and REMAND for a new trial.

---

[31]     *Goldsbury v. State*, 342 P.3d 834, 838 (Alaska 2015).

[32]     *Adams*, 261 P.3d at 774-75.

[33]     *See id.* at 774.

[34]     *Id.* Because the prosecutor's statements accusing Hess's defense attorney of vilifying the victim meet our test for plain error we do not reach his argument that the improper prosecutorial remarks affected his constitutional rights.